**GOVERNMENT OF the CANAL ZONE**

v.

**Paul Ken FURUKAWA.**

**Crim. No. 6430.**

District Court, Canal Zone,
Division Balboa.

Aug. 6, 1973.

Lester Engler, U. S. Atty., and Wallace D. Baldwin, Asst. U. S. Atty., Balboa, Canal Zone, for plaintiff.

Alfred Lawrence Toombs, New York City, and Michael C. Pierce, Balboa, Canal Zone, for defendant.

## MEMORANDUM OPINION ON MOTION TO SUPPRESS

CROWE, District Judge.

This Memorandum Opinion is written as the result of a Motion to Suppress, which was heard in this court on May 31st and June 1st, 1973. The motion was made pursuant to Federal Rules of Criminal Procedure 41(e) and has to do with a quantity of cocaine found in the room of the defendant, who is a soldier, by his superior officer during an "inventory" of the defendant's effects. The attorneys for the defense and the government have filed briefs in support of their positions and this decision is rendered upon the facts at the hearing and the briefs filed.

### FACTS

The defendant, Paul Ken Furukawa, is an enlisted man in the U. S. Army, stationed at Quarry Heights, Canal Zone, and he was assigned to the Army Data Processing Center. His company commander, Captain Martin, did not schedule his duty hours, nor did he know what days he was on or off duty, as this was arranged by the Processing Center. The Captain styled himself as being "more like a hotel operator". He was in charge of Building 164 where the defendant was quartered at Quarry Heights, Canal Zone. Quarry Heights is a military compound under the direction of the military and is separate and distinct from the civilian area occupied by the civilian personnel living in the Canal Zone.

At approximately 8:10 a. m., on February 1, 1973, Captain Martin was called by Mr. Anderson, an officer of the CID, who asked for four enlisted men, Furukawa, McNeese, Walls and Weiche. These men were caused to come to the office of the Captain at about 8:35 a. m. and were arrested by the Canal Zone civilian police for offenses involving the sale and the distribution of controlled substances. The defendant, Furukawa, was charged with distribution of marihuana on January 19, 1973 and taken before the U. S. Magistrate for the Town of Balboa where bail was fixed in the amount of $500.00 on this charge.

At about 8:45 a. m., the Captain with a couple of noncommissioned officers began an "inventory" of the property of the arrested people, proceeding under Army Regulation 700–84 as the source of his authority for the inventory. The Captain and Sergeant Harding arrived at the room of the defendant at about 10:30 a. m. and in the presence of defendant's roommate, PFC Peneke, who unlocked the door to their room, a search and inventory was conducted.

The search was careful and detailed. Captain Martin opened the dresser drawer belonging to the defendant and found underneath the brown wrapping paper which lined the drawers and was taped down, three small packets containing a white powdery substance, which he took to his office and delivered to the Army's Central Intelligence Division.

Friends of the defendant, Furukawa, posted the $500.00 bail at about 3:00 p. m. on the date of the arrest and they were then told that he was being held on another charge (this charge) and he would not be released until after a hearing. The next day, on February 2nd, the Magistrate fixed additional bail of

$1,000.00 and this sum was posted by the defendant's friends and he was released about "lunch time" on that date. According to the shift schedule at the Control Data Processing Center, the defendant's days off were February 1st and 2nd and he was due back on his shift of 1600 to 2400 hours at 1600 hours on the 2nd. He would not be reported AWOL on his off days.

Captain Martin insisted throughout the hearing that he was conducting an inventory to "safeguard the property", but Sergeant Harding, who assisted in the inventory, states that the Captain said that he was either looking for "grass" or a "white powdery substance" and PFC Peneke testified that he overheard the Captain remark to Sergeant Harding, "If you find any white powder, or anything, let me know."

There was proof to the effect that the room of defendant and Peneke was securely locked with a lock that could be opened only by the keys that these men carried and one kept by "the Army" and that the inventorying of the property of absent personnel was done in other cases several days after the personnel were absent and not so "thoroughly". The room was safe and secure and air conditioned.

The four men, including the defendant, were not carried on the Morning Report as AWOL, but there was a showing that they were arrested.

No search warrant was ever issued, nor was there any search as the result of probable cause to conduct a search and seizure under military regulations.

## DECISION

■ From the above facts, the only conclusion that this Court can draw from the search and seizure that was effectuated is that it was done for the purpose of finding controlled substances and was done under the guise of an inventory. Two previous inventories that were testified to had been conducted in a leisurely manner and the last one was not done until several days after the soldier was away from the barracks.

In the instant case, the "inventory" began ten minutes after the four men were arrested and was conducted in such a detailed manner, accompanied by expressions by the Captain indicating that he was seeking white powder or grass, which completely established that it was a search and ultimately, a seizure, conducted as an inventory. This Court is not critical of Captain Martin for his zeal in trying to suppress the use of drugs in the barracks and among the military personnel, for it is certainly the duty of a good commander to try to instill into his troops good habits and eliminate conditions of law violations. The question that presents itself, however, to this Court is whether or not controlled substances seized under the pretext of conducting an inventory, no matter how meritorious the Captain's attitude may be, can be used in a prosecution in a civil court for criminal violation of the United States statutes, and this Court thinks not.

The government argues that Captain Martin was no more or less than a private individual who discovered contraband in a routine activity and that he was not acting as a police officer nor as the arm of the law in making his inventory. This reasoning is specious, for the Captain was the commanding officer of the accused, with full powers of arrest, and was in no wise a private individual as relates to Furukawa.

Army regulations recognize this condition, as is shown in the Exhibit C attached to the government's reply to a motion to suppress, filed June 8, 1973, and which is styled: "Legal Guide for Commanders" and is Department of Army Pamphlet No. 27–19. On page 2–4, under b., search is authorized by the commander. It states that paragraph 152 of the Manual for Courts-Martial "gives a commander authority to conduct or direct a search of any person or property located in a place under his control if there is "probable cause" to justify the search." There is a detailed

setting out of the requirements of probable cause under paragraph (2), which are as follows:

"... Before a commander may authorize a search of a person or area under his control, he must have probable cause to believe that—

"(a) A crime is being committed or has been committed;

"(b) The person to be searched committed or is involved in the crime;

"(c) The evidence of the crime is now where the commander plans to search; and

"(d) The information and the source of the information are reliable."

"There must be more than mere suspicion in the mind of the commander, but absolute proof beyond a shadow of a doubt is not required. In other words, probable cause lies somewhere between suspicion and actual knowledge."

The Legal Guide for Commanders, referred to above, sets out on the same page a paragraph concerning inventories, which states as follows:

"(C) Inventories. When a soldier is AWOL, about to be confined, or detained by civilian authorities, an inventory of the soldier's belongings is required. (chap. 10) Evidence obtained as a result of this inventory is admissible in a courts-martial."

Therefore, the sections above referred to, which are under the main heading of "Authority to Search", demonstrate clearly that the Army, in the protection of its personnel, makes a strong distinction between a mere inventory and a search. It does permit evidence obtained in an inventory to be used in a courts-martial. But, as stated above, this was an obvious search and seizure under the guise of being an inventory and should have been conducted as done only after a determination of probable cause. A proper inventory would have been within the authority of Captain Martin as the defendant was "detained by civilian authorities".

The Court will not attempt to decide in the matter the validity of the use of the evidence in a courts-martial. The problem we have here is its use in a civil court. Merely because a man is a member of the armed forces does not mean that he should be deprived of his rights to constitutional protections afforded others in our civil courts. He is entitled to all the safeguards in such actions as civilians. Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L. Ed.2d 134 (1959); Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

The accused was arrested on his day off, bail was fixed for him in the first case involving the marihuana and he would have been released that day had it not been for the discovery of the white powder in the "inventory". As a consequence of the discovery, this charge was placed against him and additional bail required, which was deposited, and he was released on the second day prior to his regular duty hours so he was never AWOL. The room in which he and Peneke lived was securely locked, and an inventory for safeguarding his personalty was certainly unnecessary as there is no showing that the placing of his personalty in some Army storeroom or locker would make it any more secure than in his own locked quarters with his roommate still living there.

The Federal Rules of Criminal Procedure are applicable in the Canal Zone and we operate under Rule 41 in matters of search and seizure. Title 6, CZC § 4741 specifically refers to the rule and makes applicable the laws of the United States.

The only case that is reported in the Canal Zone that is in point seems to be United States v. Almoguera, which was decided in the Cristobal Division of the Canal Zone Court in 1922 before the adoption of the Federal Rules here and is reported in the old Canal Zone Reports in Volume 3 at page 402. This case does not involve the military, but there is considerable similarity, for the defendant, Almoguera, was a steerage steward on the

S.S. ECUADOR which was lying at one of the docks at Cristobal, and "the defendant had assigned to him a room for his personal use, to which he carried the key, and to which no one else had access. At a time when the defendant, Almoguera, was absent a member of the Canal police force, with the consent of the captain of the steamship, broke open the door of his room, and took therefrom certain articles of a narcotic character, the possession of which for certain purposes is prohibited by the Harrison Narcotic Act." The court held that the search and seizure were illegal and stated, "The only possible justification of this act was the consent of the captain of the boat. Without this consent the officer would have had no color of right to have invaded this man's private room without a search warrant, issued as required by law. Could a landlord give an officer consent to enter the house of a tenant and make search? Clearly not. What in principle then is the difference? That room was as sacred to the steerage steward in law as would be the castle to the lord. It had been assigned to him and he carried the key thereto. It could be invaded by an officer of the law, and searched, only in the manner prescribed by law."

 The presence of Peneke, the roommate who unlocked the door, added nothing to Captain Martin's right to search. The consent of one person cannot extend to the portion of the premises within the exclusive control of the other. United States v. Hughes, 5 Cir., 441 F.2d 12, cert. den. 404 U.S. 849, 92 S.Ct. 156, 30 L.Ed.2d 88 (1971).

Senior Judge Ferguson of the United States Court of Military Appeals wrote an opinion of the court in United States v. Mossbauer, 20 USCMA 584, 44 CMR 14 (1971), which has been cited by both the government and the defendant in this case and the facts are quite similar to the case at bar. As stated by Judge Ferguson, "the primary issue . . . is whether or not Lieutenant Trauner, as company commander of his unit, has used an administrative inventory to effect an illegal search." It was held that such a subterfuge was illegal and that an inventory regulation must strike a fair balance between legitimate governmental need and the right of the individual to privacy. United States v. Kazmierczak, 16 USCMA 594, 37 CMR 214; United States v. Welch, 19 USCMA 134, 41 CMR 134 (1969).

The court went on to say, "The undue alacrity with which the inventory was initiated . . . and the thoroughness with which the "inventory" was conducted, belie the assertion that this was a routine "inventory" within the provisions of Army Regulation 700–84, paragraph 6–2, for the sole purpose of safeguarding" the property of the accused.

The motion to suppress the evidence is sustained and the white powder confiscated shall not be admissible in evidence at any hearing or trial. It is quite probable that the "white powder" is cocaine, although it was not so established at the hearing on the motion to suppress, and if it is cocaine, it should be retained by the authorities and destroyed in accordance with law.