UNITED STATES, Appellee

v

LOUIS E. MOSSBAUER, Staff Sergeant,
U. S. Army, Appellant

20 USCMA 584, 44 CMR 14

No. 23,685

June 18, 1971

*Captain Terrence Ahern* argued the cause for Appellant, Accused. With

him on the brief were *Colonel George J. McCartin, Jr., Major Alan W. Cook,* and *Captain Paul C. Saunders.*

*Captain Thomas W. Phillips* argued the cause for Appellee, United States. With him on the brief were *Colonel David T. Bryant, Lieutenant Colonel Ronald M. Holdaway,* and *Captain Richard K. Bank.*

## Opinion of the Court

FERGUSON, Senior Judge:

The accused was convicted, contrary to his plea, of a single specification alleging that he "did, . . . wrongfully have in his possession 0.36 ounces, more or less, of marihuana," at Ford Hood, Texas, in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934. He was sentenced to a bad-conduct discharge and reduction to the grade of E–1. The Court of Military Review affirmed the findings of guilty but only so much of the sentence as provided for reduction to the grade of E–1. We granted review to consider the following issue raised by appellate defense counsel:

> Whether the appellant was substantially prejudiced by the admission into evidence of Prosecution Exhibit 1, a field jacket, and other testimonial evidence garnered as a result of an unlawful search and seizure.

The facts surrounding the issue are not in dispute, only their interpretation. As trial counsel conceded, during argument on the admissibility of the evidence, "the primary issue . . . is whether or not Lieutenant Trauner, as company commander of his unit, has used an administrative inventory to effect an illegal search."

Lieutenant Trauner testified that when he appeared at his office at about 5:30 a.m. on Monday, January 12, 1970,

he observed an entry on the Charge of Quarters' log reflecting that the Provost Marshal, III Corps, had called and reported that the accused had been picked up in Belton City for indecent exposure and possession of marihuana. The accused was on weekend pass at the time. Prior to 7:30 a.m., Lieutenant Trauner telephonically contacted the police dispatcher at Belton City and verified this information. At that time he was unable to determine how long the accused would be held in custody as "the judge had not gotten there yet to set bail." Lieutenant Trauner "assumed he was going to be there at least several hours if not a day or more." Upon receiving this information, he directed the executive officer, Lieutenant Sweat, to inventory the accused's gear and secure it in the supply room. Lieutenant Trauner believed that the accused returned to his unit later the same day.[1]

Lieutenant Sweat testified that at about 7:15 a.m. on January 12th, he was instructed by Lieutenant Trauner to inventory the gear of "Sergeant Mossbauer [who] was being confined in Belton for possession of marihuana and indecent exposure." The accused roomed in what was referred to at trial as a "private room" with Specialist Four Wallace, who was present at the time. Since the accused's wall locker was secured, it was necessary to cut the lock with a bolt cutter. In the pocket of a field jacket, "some tobacco

---

[1] A Criminal Investigations Detachment report of investigation, included in the papers considered by the Article 32 investigating officer, revealed that at about 1:25 a.m. on January 11(?), 1970, an officer of the Belton, Texas, Police Department, observed the accused get out of his automobile and urinate on the street. He was arrested and taken to the local jail where an inventory of his effects disclosed a small bag of vegetable matter, believed to be marihuana, in the pocket of his trousers. He was detained in jail pending appearance before a Justice of the Peace. About 10:00 a.m. on January 12th, the accused appeared before the Justice of the Peace and was released on bond pending future civil court action. (The pretrial advice to the convening authority reflects the date of accused's arrest in Belton as January 12, 1970.)

like matter along with some cigarette papers" was found. Because there was a question in his mind whether the substance was in fact tobacco, Lieutenant Sweat directed Private Singleton to call the Criminal Investigations Detachment (CID) in order to have a positive identification made. Lieutenant Sweat acknowledged, on cross-examination, that he could have been influenced into conducting a more thorough than usual inventory because of the local charges against the accused, and that he probably would not have called the CID had he been unaware that the accused was then pending civilian charges for possession of marihuana. In response to a question by the military judge, Lieutenant Sweat acknowledged that when he first saw the "tobacco like substance," it looked to him "[l]ike ordinary tobacco."

CID Agent de Jongh, upon viewing the substance found by Lieutenant Sweat, believed that it contained marihuana. Since "[i]t was a very small amount," he called his superior to determine whether "he wanted us to get involved with this particular amount. . . . He said to bring it in." He suspected the presence of marihuana because of the color. "There was about 80 percent tobacco and 20 percent of vegetable matter which I took at that time to be vegetable matter." Agent de Jongh testified that upon later microscopic examination he determined that the substance consisted of "ten to fifteen percent marihuana, seventy percent tobacco, and ten percent hairs or fibers." The total amount of marihuana was estimated by de Jongh to be "less than 0.10 grams."

In United States v Kazmierczak, 16 USCMA 594, 600, 37 CMR 214 (1967), this Court held that a similar Air Force regulation, providing for the inventory of an arrested serviceman's personal property, was not *per se* contrary to the constitutional prohibition against unreasonable searches and sei-

zures. We went on to state, however, that:

"It is well settled that the private possessions of a member of the military are not open to indiscriminate search for evidence of criminal conduct. United States v Battista, 14 USCMA 70, 33 CMR 282 [1963]; cf. United States v Gebhart, 10 USCMA 606, 28 CMR 172 [1959]."

Manifestly, inventory procedures may not be used as a subterfuge to conduct an illegal search. An inventory regulation must strike a fair balance between legitimate governmental need and the right of the individual to privacy. United States v Kazmierczak, supra. "[T]he test remains one of reasonableness." United States v Welch, 19 USCMA 134, 136, 41 CMR 134 (1969).

What then of the "reasonableness" of the inventory in this case? Lieutenant Trauner testified that he authorized the inventory under "AR 735." He was unable to quote the provisions of the regulation but stated that the inventory is a requirement in those cases where a serviceman is reported as being absent without leave or in confinement. "If we ascertain that he is going to be retained for an indefinite time or if the guy is missing for the majority of the morning, we will inventory."[2] According to Lieutenant Sweat, inventories "are ordinarily conducted 24 hours after a man is reported absent from the unit." First Sergeant Kelley, who took no part in this activity, testified as follows, in reply to a question from trial counsel as to the standing operating procedure in the battalion with regard to property and the care of it for absentees:

"Sir, we have to follow AR 784 [700–84] which governs all types of absentees, be the man AWOL or in civilian confinement for any length of time. It states in the regulation

[2] In his sworn pretrial testimony, Lieutenant Trauner stated, "I have established this procedure [inventory] for anyone who is AWOL or in confinement more than 24 hours because I have had quite a bit of trouble with missing equipment if left unsecured."

which is paragraph 6–2[3] that the man's clothing will be inventoried. It doesn't give a specific time limit but normally we go by an eight hour basis. If a man is apprehended for more than eight hours we safeguard his personal property. That is it is inventoried and is locked in the unit supply room for safe keeping."

Lieutenant Sweat acknowledged that he probably conducted a more thorough inventory than he had in other cases because of the accused's arrest. He admitted that he did not look or feel in all of the pockets of all of the clothing. While the *safeguarding* of the accused's effects was emphasized as the motivating factor behind the inventory, items of importance such as "personal papers, bills, and little notes, and stuff like that," which were also found in the same pocket as the marihuana, were not even listed on the inventory, either singly or in bulk. Assertedly, these were all placed in a plastic bag and should have been "listed with the personal affects [sic] as personal letters." That they were not so listed, in this case, was attributed by Lieutenant Sweat to a failure on the part of Specialist Singleton who typed the list to include them.

Specialist Singleton assisted in conducting the inventory by recording the items found by Lieutenant Sweat. When he testified that he didn't believe that this inventory was more thorough than others in which he had assisted, he was shown his sworn Article 32 testimony in which he had stated:

"The CID is not usually called when tobacco-like particles are observed, in fact I remember one other time when some particles fell out of a duffle bag and the CID was not called. It was my opinion that LT Sweat was more thorough in this inventory than previous ones. I won't say he was conducting a search but it is my opinion that he was looking for something."

Singleton's attempt to explain his pretrial statement was as follows:

"Sir, may I verify this? What I meant by this was that a person conducting an inventory such as this type—he deep down self-consciously knows the man is being held for possession of marihuana. Therefore, he will truthfully and deeply involve a more detailed search or more thorough search. What I'm saying is that anybody conducting an inventory would probably look harder for evidence of possession of an individual being held on such charge."

One cannot read the testimony of the Government witnesses, herein presented, without gaining the abiding impression that the entire proceedings were designed to effectuate a *search* of the accused's belongings for the purpose of determining whether marihuana was present. Cf. United States v Santo, 20 USCMA 294, 43 CMR 134 (1971). The circumstances of this case are unlike those in *Kazmierczak* where the accused was arrested and confined by military authorities for illegal entry into the base post office and the likelihood of his early release was indeed remote. Here, the release of the accused depended only upon the appearance of the Justice of the Peace and the accused's ability to meet the bail requirements. He was in fact released at 10:00 a.m. on the same day. A more complete inquiry quite likely would have revealed that eventuality. The undue alacrity with which the inventory was initiated, contrary to the standing operating procedure of the battalion (eight hours) and the usual twenty-four hour wait instituted by Lieutenant Trauner; the fact that those responsible for the inventory supplied themselves with bolt cutters prior to their arrival at the accused's "private" room; and the thoroughness with which the "inventory" was conducted, belie the assertion that this was a routine "inventory" within the provisions of Army Regulation 700–84, paragraph 6–2, for the sole purpose of *safe-*

---

[3] See Appendix. At trial, the military judge took judicial notice of AR 700–84, paragraph 6–2. Defense counsel acknowledged that AR 735–2, referred to by Lieutenant Trauner, "basically recites about the same thing."

*guarding* the property of an absent serviceman. Cf. United States v Elwood, 19 USCMA 376, 378, 41 CMR 376 (1970).

In sum, we hold that, under the circumstances here presented, the "inventory" of the accused's per-■■■■ ■ sonal property was unreasonable. United States v Kazmierczak, supra. The military judge, therefore, erred in ruling to the contrary, and the issue is resolved in favor of the accused. United States v Santo, supra.

The decision of the Court of Military Review is reversed. The record of trial is returned to the Judge Advocate General of the Army. The Charge and its specification is ordered dismissed.

### APPENDIX
### AR 700–84, January 30, 1970

"*6–2. Disposition of clothing of absentees. a. Inventory.* Immediately upon notification that an individual is absent from his unit without authority, the unit commander will cause all property left behind by the individual to be inventoried by an officer, warrant officer or noncommissioned officer in grades E–6 through E–9. The individual designated to take the inventory will assure himself that the clothing abandoned is actually the clothing of the individual who is absent without leave. Further, he will make certain that the clothing is not exchanged for that of any other individual in the unit or organization. The items and quantities of personal military clothing will be listed on plain paper, (in triplicate) by the unit supply officer and verified and initialed by the unit commander. A separate listing will be prepared for each individual. The original copy of the listing, after having been signed by the individual conducting the inventory, will be placed in the duffel bag or suitable container and the remaining two copies will be retained in the unit suspense file pending further action. Privately owned personal property will be inventoried in accordance with AR 630–10.

"*b. Safekeeping.* Immediately upon completion of inventory prescribed in *a* above, the clothing of the absentee will be placed in the unit supply room for safekeeping.

"*c. Return of individual.* Should the enlisted individual return to the unit or organization prior to being dropped from the rolls, the clothing will be returned to the individual who will acknowledge receipt thereof on the original copy of the listing. The two copies retained in the unit suspense file will be destroyed. The unit commander will determine that the individual has in his possession the initial allowances of personal clothing. Should a shortage exist, such shortages will be replaced at the expense of the individual.

"*d. Abandoned clothing of enlisted personnel dropped from the rolls.* Clothing will be retained in the unit for a period of 120 days. Upon notification that return to military custody, within 120 days, was accomplished at an installation other than the one from which the individual absented himself, the commanding officer of the absentee's former station will ship the abandoned clothing to the absentee's new station, administratively determine the amount of expense occasioned the United States in forwarding the abandoned clothing, and forward this finding to the absentee's new station for collection from the absentee's pay (see part 7, DODPM). At such time as 120 days have elapsed, the clothing will then be placed in the duffel bag (or suitable container) and turned in through supply channels for reclassification and return to stock, except that nonrecoverable items will not be reissued. In the case of National Guard or Army Reserve (Reserve Enlistment Program Personnel, REP 63), inventoried clothing will be processed as provided for excess clothing in AR 135–460. DA Form 3161, prepared as outlined in AR 711–16, will be completed to indicate turn-in to the appropriate supply officer and will accompany the clothing upon turn-in. The appropriate accountable officer will retain the original and return two receipted copies to the unit. One copy will be filed with the unit supply records and the other forwarded to the unit personnel officer for

filing. Disposition of records will conform with the provisions of AR 630–10."

Judge DARDEN concurs.

QUINN, Chief Judge (concurring in the result):

Here, as in United States v Kazmierczak, 16 USCMA 594, 601, 37 CMR 214 (1967), there is some inconsistent testimony as to the circumstances that led to the seizure of the evidence in issue, but my own evaluation of the evidence convinces me that the inventory procedure was not used as "a pretext to ferret out possible evidence of a crime." Consequently, I disagree with the majority's "abiding impression" that the inventory procedure was deliberately invoked "to effectuate a *search*" without probable cause. However, I am convinced that the conduct of the inventory which eventuated in a seizure of the tobacco particles was without probable cause.

Unlike the situation in *Kazmierczak*, the inventory taker here was not "unexpectedly confronted with evidence of an apparent crime." *Id.*, at page 603. All that he found was "some tobacco like substance," which to him looked like "ordinary tobacco." He, therefore, had no reasonable cause to subject the material to police inspection. See Mayfield v United States, — F2d — (CA DC Cir) (1971). For this reason, I agree with the majority that the evidence as to the presence of marihuana in the tobacco should not have been admitted, and I agree with its disposition of the marihuana charge.