UNITED STATES, Appellee,

v.

Richard R. LAW, Staff Sergeant, U.S.
Marine Corps, Appellant.

No. 42,402.
NCM No. 79–1011.

U.S. Court of Military Appeals.

March 12, 1984.

For Appellant: Lieutenant Jerome A. Busch, JAGC, USNR (argued); Lieutenant Commander I.D. Warden, JAGC, USN and Captain E.A. Burnette, USMC (on brief); Lieutenant Judith S. Robinson, JAGC, USNR.

For Appellee: Commander Jay M. Siegel, JAGC, USNR (argued); Captain T.C. Watson, Jr., JAGC, USN (on brief); Commander W.J. Hughes, JAGC, USN.

### Opinion of the Court

EVERETT, Chief Judge:

On February 2, 1979, a military judge sitting as a special court-martial at Makiminato Service Area, Okinawa, Japan, convicted appellant of stealing stereo component equipment and cassette tapes which belonged to another staff sergeant, in violation of Article 121, Uniform Code of Military Justice, 10 U.S.C. § 921. Law was sentenced to a bad-conduct discharge, confinement at hard labor for 2 months, and reduction to the lowest enlisted grade. The confinement portion of the sentence was eliminated by the convening authority when he otherwise approved the sentence, and the supervisory authority approved the sentence as modified. By an unpublished *per curiam* opinion dated October 29, 1981, the United States Navy-Marine Corps Court of Military Review (Baum, J., dissenting) affirmed appellant's conviction, after concluding that the stolen property had been found in appellant's suitcase during a properly conducted inventory.

Subsequently, we granted review to determine whether the equipment and tapes had been seized from Law as a result of an unreasonable search. 13 M.J. 98 (1982). We now resolve this issue adversely to appellant and affirm.

I

At an Article 39(a)[1] session held on a defense motion to suppress, the first witness was Special Agent Charles D. Reno of the Naval Investigative Service (NIS), who testified that on October 21, 1978, he had been informed of "a theft from a barracks room at the Makiminato Service Area." As he learned three days later, "a Pioneer cassette deck, some speakers, headphones, cassette tapes, et cetera" had been stolen from Staff Sergeant Wilson. Reno also was told that Corporal Bollo, a military policeman, had been at "the scene of the theft" when it

---

1. Uniform Code of Military Justice, 10 U.S.C. § 839(a).

occurred around 3:00 a.m. While still there an hour later, Bollo had observed Staff Sergeant Law and Lance Corporal Stanzuk "walking by Staff Sergeant WILSON's barracks"; and he "had stopped and identified these men because they were in the area within a relative time of the crime and at a late and unusual hour."

After receiving this information, Agent Reno

contacted the victim Staff Sergeant WILSON and obtained a sworn statement from him as to what had taken place, what he had lost, the circumstances surrounding the theft. I then contacted STANZUK and LAW's command to make arrangements for their interviews.

\* \* \* \* \* \*

I was advised that STANZUK was still on board, but that LAW had rotated back to the States on emergency leave. Because he had served over nine months on Okinawa, he was given a set of PCS orders to somewhere in the States.

Reno proceeded to interview Stanzuk, who

had informed me, ... that on the night that the theft took place he had been with Staff Sergeant LAW and Staff Sergeant LAW's roommate, Staff Sergeant TRISDALE, and two other Marines—I believe they are also lance corporals— HOLVIS and OLDENBERG, at a party which took place in a space occupied by Staff Sergeant LAW and Staff Sergeant TRISDALE. STANZUK had informed me that, during the course of the evening, they had—about 0300—gone out and had been in the area of Staff Sergeant WILSON's barracks but did note that they did not enter anybody's room or steal any equipment. STANZUK—I asked STANZUK if he knew if Staff Sergeant LAW had taken anything. He said he did not. He informed me that the next time he saw Staff Sergeant LAW was the next morning, and Staff Sergeant was preparing to pack-out and return to the States on emergency leave. I asked STANZUK if he had seen Staff Sergeant LAW packing any stereo equipment, possibly his own stereo equip-

ment—had he seen him packing any stereo equipment at all. He said he had not, he just saw him packing three cardboard boxes. I asked him—he said he didn't see what went into these cardboard boxes. He noted that one of them was heavy enough that it could contain stereo equipment. STANZUK then specifically described these three cardboard boxes.

Agent Reno consulted Captain Hopson, a member of the staff judge advocate's office, "for guidance as to whether there was probable cause for search or if he felt that there was anyone present in Okinawa who would be in position to get a permissive search." Hopson did not believe that probable cause existed to authorize a search of the boxes which appellant had left behind in his room.

Reno then discussed the situation with Major Walke, appellant's company commander, and advised him "that it appeared that there was not probable cause for a command-authorized search and that it appeared there was no one presently on the island who had possession of the boxes to appoint [sic] that they could gain a permissive search." When informed "that there was at least these three boxes, that there was still gear in the [appellant's old] room," the Major "appeared somewhat surprised that there was still gear in the room" and

felt that as Staff Sergeant LAW had permanently rotated from the island that this gear should be seized by the command for safekeeping, and then arrangements be made for the return to Staff Sergeant LAW.

Major Walke assigned his executive officer, Captain Lesnowize (then a lieutenant), to "go to the room to inventory the gear"; but, Agent Reno advised the commander

that under no circumstances, during this seizure for safekeeping, should those three specific boxes that were in question be opened for inventory purposes; that Captain HOPSON was looking into a way of obtaining search; and that they should not be opened for any reason, seized solely for safekeeping.

Before performing the inventory, Lesnowize went with Reno to Stanzuk's room, where the agent "conducted a consent search" in pursuit of "evidence linking STANZUK to the theft of Staff Sergeant WILSON's room." However, no incriminating evidence was found. Though Captain Lesnowize was "present" during that search, he did not participate in it; and according to Reno, he was only "present to provide privacy and to allow the security of the search"—that is, "to keep people away while I was doing the search."

From Stanzuk's room, Reno and Lesnowize proceeded to the room in which Law had been living, in the same barracks as Stanzuk's room. Reno went with the officer "solely for the purpose of pointing out those three boxes described to me by STANZUK that were not to be opened for inventory." According to Reno's testimony, the room was

> one large room that is somewhat partitioned to make it into two rooms.... [I]t appeared like a living room and a bedroom that was now being used as two bedrooms.
>
> *   *   *   *   *   *
>
> [T]here were—in the middle there were partitions coming out, floor to ceiling, from both walls. These partitions stopped about four and a half feet from each other, spaced four and a half to five feet. This space between the two partitions was not obstructed in any way. There were no curtains; there was no door; there were no marks indicating that there ever were hinges for a door. It was simply an opening, four and a half, five feet between these two partitions.

Appellant's roommate, Staff Sergeant Trisdale, had been living "on the other side of this semi-partitioned room"; but as Agent Reno had been informed earlier, Trisdale "was off island and would return in approximately ten days." Reno recited:

> When we entered the room, we found there was a lot more there than we had initially expected. There was a bed, with full bed linen; a nightstand, with a lamp; a radio; a footlocker, obviously filled; a

duffle bag; two of the three boxes described by STANZUK in LAW's portion of the room. It was really kind of hard to tell that anybody had moved out of there. There was still a number of items in the room.

*   *   *   *   *   *

[I]n LAW's portion of the room we saw two of the three boxes described by STANZUK. Looking through this open archway into TRISDALE's portion of the room, we saw the third box described by STANZUK sitting three or four feet inside the archway into TRISDALE's area.

Reno could not recall whether any other "indication of ownership was on" the third box "other than the type of description given by STANZUK and the fact that there were no other boxes, other than those three boxes, in the entire space."

Contemporaneously, Reno and Lesnowize also observed in Trisdale's portion of the room "a brown Samsonite suitcase," which, according to Reno, was "sitting on top of this cardboard box." Because the suitcase was on Trisdale's side and displayed no "indication of ownership"—that is, "[t]here were no marking[s] or airline tags, initials or anything of that nature which would indicate who owned that suitcase"—it "became a question" whether the suitcase belonged to Trisdale or appellant. Reno testified that,

> as there was no way of telling from the exterior of the suitcase who it belonged to, Captain LESNOWIZE opened the suitcase, indicating—I don't know his exact words but it was something like: Maybe we can find something in here that will tell us whose it is. It was apparent that he was opening it to ascertain ownership.

As Lesnowize "hit the latch" on the suitcase, it "popped open"; and Reno saw two things inside: One was "a Pioneer CTF 1000 stereo cassette deck"—the same kind of tape player which had been stolen from Staff Sergeant Wilson. The other item "was a handwritten" note from appellant to Stanzuk, which was "sitting on top of" the

stereo cassette deck and stated "in effect: Please mail this to me." Reno "personally examined the serial number to see if it was, in fact, the CTF 1000 stereo cassette deck Staff Sergeant WILSON had reported missing and found from serial number comparison that it was that cassette deck." In order to see the serial number on the cassette deck, Reno had "[l]ook[ed] around behind it" and "may have had to lift it up to look behind it."

Agent Reno then called Captain Hopson at the staff judge advocate's office to see whether he now had probable cause to search all of Law's effects. According to Reno,

> I then asked Captain LESNOWIZE if he had authority as Executive Officer to grant a permissive search—I'm sorry—to grant a command-authorized search. Captain LESNOWIZE said he did have authority to grant a command-authorized search. I then requested a command-authorized search for Staff Sergeant LAW's spaces because the note bore the signature of Staff Sergeant LAW and also for Staff Sergeant TRISDALE's spaces because the gear was actually found in his portion of the room.

The request was granted and, according to Reno,

> [w]e found upon opening one of the two cardboard boxes that was in Staff Sergeant LAW's portion of the room—One of these two boxes had been described by STANZUK. Upon opening one box, we found a set of stereo headphones identical with those described missing by Staff Sergeant WILSON. I found a cardboard box which is a case of stereo tapes—cassette tapes, a cardboard box with the name—the brand name—TDK on it. Staff Sergeant WILSON had mentioned that he was missing such a box. I found a TDK cardboard box, and written on this TDK cardboard box was two words: "Yea (Y–E–A) WILSON." Going on through the box, I found an assortment of cassette tapes already recorded. These I also identified as belonging to Staff Sergeant WILSON because of the mark-

ings on the cassette tapes. WILSON had informed me of a specific way that he marked his tapes. These tapes in Staff Sergeant LAW's box were marked in that fashion.

Subsequently, Agent Reno reinterviewed Stanzuk and showed him one or two pictures of the retrieved stolen stereo equipment and a xeroxed copy of the note that Law had written him. At that time, Stanzuk "admitted knowledge of the theft" and also implicated appellant.

Major Walke, the second witness at the hearing on appellant's motion to suppress, testified that, on October 25, Agent Reno related to him that two members of his company—Lance Corporal Stanzuk and Staff Sergeant Law—had been present in an area where a larceny had occurred about one hour before. Reno had been told by Stanzuk "that Staff Sergeant LAW had left behind, when he had been transferred, some gear in his room." Law had left Okinawa a day or two before Walke's conversation with the NIS agent. However, his gear had not been inventoried when he departed, because

> [w]hen Staff Sergeant LAW left, he left on emergency leave; and he came into my office just before he left. I asked Staff Sergeant LAW if he had taken care of all his gear, if he had any gear remaining to be secured or to be shipped or anything. He indicated that it was all—had all been taken care of. He had checked out of his quarters, and everything was cleared. I did not believe that there was any further gear that belonged to Staff Sergeant LAW left here that had not already been mailed or shipped, TMO, or whatever.

When Walke, the company commander, learned from Reno that some of appellant's property still remained in his room at the barracks, "[i]t was a surprise that Staff Sergeant LAW still had a room, first, and second thing, that he still had gear left in it."

Walke explained that, when an individual in his command was reassigned and left property,

[m]y responsibility as commanding officer is to secure the gear and provide safekeeping; and the policy within the company that's been established is that if a person is going to be away for any more than just a temporary period of time—and "temporary" is open to debate as to whether we're talking about two weeks, a month, or whatever—they will normally turn their gear into the Company police sergeant, who has a security cage where he stores that gear in case of UA's, people who are hospitalized unexpectedly, or persons who are transferred on emergency leave. They're to turn this gear in to the Company Supply. If they cannot, then a staff NCO or an officer must inventory that gear and turn it in there to await shipment.

In light of his responsibility to store appellant's gear, Major Walke "ordered my executive officer, Lieutenant LESNOWIZE, to go inventory that gear, that gear into custody, place it in my Company Supply personal effect security cage for safekeeping."

Major Walke's reaction to the information he had received from Agent Reno about appellant's presence in the area of the theft is described in this testimony:

I really took it as being insignificant and inconsequential. It didn't surprise me because the area where the full interrogation report reported that Staff Sergeant LAW and STANZUK were, was adjacent to the staff barracks. Staff Sergeant LAW used to live in the staff barracks. I thought it was entirely within reason that he should be there.... I didn't think it too unusual that a staff sergeant would be out at that time of the night. I didn't consider it of any great consequence.

Furthermore, Walke did not believe that appellant was implicated in this crime,

because Staff Sergeant LAW had an extremely fine reputation in the Company. I personally had a lot of confidence and trust in him. He had been one of the leaders in my machine shop. Prior to that, he was with H and S Company and

had a job over there as company gunnery sergeant; and he had, of the staff NCO's in the Company, an extremely fine reputation. From my personal observation, he—I think—had always been extremely good.

Major Walke did not feel that there was probable cause to search appellant's room. He had sent Lesnowize "[t]o secure his gear" and had no intention that it be searched. Although Sergeant Trisdale, who shared the room with appellant, was away from Okinawa at this time, Walke did not have his gear inventoried,

[b]ecause he was only away for a short period of time, expected duration to be of a week. He was sent, TAD, to IWAKUNI for a welding school that was supposed to be about five days duration, to go up and come right back.

Trisdale—who was "to occupy the same room when he" returned—had been told before he departed "to ensure that his valuables were secure ... The other stuff was to remain in his room."

Major Walke testified that he was empowered "to authorize a command search" in his company; and under delegated authority, his executive officer could do so in his absence. On the evening of October 25, Lesnowize had authorized the search while Major Walke was attending a rehearsal of "Fiddler on the Roof"—some 27 or 28 kilometers away in a gymnasium at Kadena Air Base. "There was not a phone there," so "LESNOWIZE was in charge."

The testimony of the Government's next witness, Captain Lesnowize, conformed generally to that of his two predecessors. He explained that he had gone with Agent Reno to Stanzuk's room because "my commanding officer directed me to accompany Mr. Reno down there to ensure that the rights of Lance Corporal STANZUK—as command representative, to make sure that Lance Corporal STANZUK was being treated fairly." The reason he went with the NIS agent was further described in this manner:

Well, speaking from experience, NIS agents have a tendency to treat our Ma-

rines like a bunch of—pieces of hamburger. So, I wouldn't let an NIS agent in the barracks without somebody being there to ensure that our Marines are being treated properly and that their rights are being protected.

He had not participated with Reno in the search but simply had observed, "making sure that everything was all right."

The company commander had also directed him to inventory appellant's property, and when he went to Law's room for this purpose, he was accompanied by "the BOQ representative" and by Agent Reno. According to Lesnowize, the room was separated into two parts by a partition about eight feet high, and the side that belonged to Staff Sergeant LAW had "all kinds of gear in it." In addition to the "boxes in . . . LAW's half of the room, . . . there was a box on the other side of the room that—I believe it had Staff Sergeant LAW's name on it; or it looked like the other boxes. It appeared that it was Staff Sergeant Law's that was on TRISDALE's side of the room, sitting in the middle of the floor." Also, "there was a suitcase sitting next to it or near it" "on Trisdale's side of the room." The only thing to indicate who owned the suitcase was "its proximity to the box that was Staff Sergeant LAW's." Lesnowize wondered as to the ownership of the suitcase, "because it was on Staff Sergeant TRISDALE's side." He explained in this manner his desire to know what was in the suitcase:

> Well, I have to in an inventory situation. Actually, I inventory the boxes as boxes; but, eventually, before we could have shipped it, we would have had to open up the boxes for customs for when customs comes down—government movers come down, they go through everything.

Upon opening the suitcase, Lesnowize saw "a cassette tape player" and his reaction to this discovery was described by him in this manner:

> Well-first of all, I don't mean to back him up; but Staff Sergeant LAW was probably one of the best staff sergeants we had

in the Company. The last thing that I ever intended to find was anything that would implicate Staff Sergeant LAW. That wasn't the intention—my intention. When I hit the latch of that suitcase—evidently, the cassette player was forced in. When I hit the latch, that thing just popped open; and there was a tape player sitting there and a note to Lance Corporal STANZUK. My reaction to that was: That's the last thing I ever expected to see.

Lesnowize checked "the serial number" which "jibed with the information that Mr. RENO had there on his sheet." The witness also explained that serial numbers were checked "any time you inventory somebody's gear—serialized gear that costs a lot. You always record the serial numbers like that."

About 6:30 p.m.—upon discovering the cassette tape player—Agent Reno called Captain Hopson again; and after that conversation, he requested permission from Lesnowize to search the room. Meanwhile, Staff Sergeant Wilson had been called over by Reno to appellant's room and had "positively identified . . . [the property] from scratches on the tape deck." Since he concluded that probable cause now existed, Lesnowize signed a search authorization, and Reno conducted the search.

Asked whether he had initially gone into appellant's room "to investigate the suspicions of Agent RENO," Lesnowize responded:

> No, because I thought Agent RENO was "out in left field." My purpose was that I was sent down there to pick up Staff Sergeant LAW's gear, get it back up to the security cage, and then get it shipped to him—you know—properly. I thought Mr. RENO was all wet, personally.

Lesnowize testified that in the absence of his commanding officer, Major Walke, he had "verbal authority" "to authorize a search." On that evening, by the time he and Reno got into appellant's room, it was around 6:00 to 6:30 p.m.; "and by that time, Major WALKE was already away

from work, and I had no way of contacting him. I believe at that time he was involved in something at KADENA, at a play or something."

On cross-examination about why he entered appellant's room, Lesnowize responded:

My purpose was to get in the room, pick up the gear, inventory it, and get it in the security locker. Mr. RENO expressed a desire just to see if those boxes were there, as STANZUK had told him— the boxes that Staff Sergeant LAW had in his room. Mr. RENO just wanted to see if the boxes were there; and, in fact, they were.

Lesnowize insisted that, before opening the suitcase, it had never crossed his mind that stereo gear might be concealed therein. According to Lesnowize, it was "customary to fill out inventory forms"; and he had some of those forms when he went into appellant's room. He conceded that it was not "customary to have NIS agents present when he conduct[ed]" an inventory. He explained:

The only thing required by Battalion order—within 48 hours of the individual being gone—supposed to have the gear picked up and secured and inventoried, and by also Group order—has to be staff NCO or officer to do it.

After Reno, Walke, and Lesnowize testified as government witnesses on the motion to suppress, appellant took the stand in his own behalf. He related that on October 24, 1978, he had a brief conversation with Major Walke, his commanding officer, which he described as follows:

Major WALKE at that time was actually thanking me for the job that I had done with Third Maintenance Battalion, GSM Company—same time asked me if I had my gear secured to be sent home. At that time I told him yes, I did, I had prior arrangements with Staff Sergeant BARNETTE to ship my footlocker and my seabag home, I had another person lined

up to mail a few of my boxes that I had home.

Lance Corporal Stanzuk testified that on October 25, he had been interviewed by Mr. Reno for the first time. Stanzuk had denied participating in the theft of stereo gear from Staff Sergeant Wilson and knowing who had stolen the gear. When reinterrogated by Mr. Reno on October 30, 1978, he was shown "[a] picture of stereo equipment on the floor" and the letter from Law to him. Stanzuk then admitted to the theft and also implicated appellant.

After the judge heard evidence on appellant's motion to suppress, he denied the motion, and appellant entered pleas of not guilty. Then the judge heard evidence on the merits and made his findings as to the charges.[2]

## II

### A

#### Inventory of the Suitcase

At trial and on appeal the Government has sought to justify the opening of the suitcase by Captain Lesnowize as being part of a lawful inventory. On the other hand, appellant has contended that the "inventory" was a subterfuge to perform a search for which no authorization could be obtained for lack of probable cause.

Certainly, it is "established that the inventory search constitutes a well-defined exception to the warrant requirement." *Illinois v. Lafayette*, —— U.S. ——, 103 S.Ct. 2605, 2608, 77 L.Ed.2d 65, 69 (1983). Therefore, if evidence of crime is discovered during the course of an inventory, it is admissible in a subsequent trial. *Illinois v. Lafayette, supra; South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *United States v. Kazmierczak,* 16 U.S.C.M.A. 594, 37 C.M.R. 214 (1967); *State v. Nelson,* 298 N.C. 573, 260 S.E.2d 629 (1979), *cert. denied,* 446 U.S. 929, 100 S.Ct. 1867, 64 L.Ed.2d 282 (1980).

---

2. Appellant was charged both with larceny under Article 121 of the Uniform Code, 10 U.S.C. § 921, and with burglariously breaking into

Staff Sergeant Wilson's room, in violation of Article 129, UCMJ, 10 U.S.C. § 929. The judge acquitted him of the second charge.

The lawfulness of an inventory is not affected by "the existence of alternative 'less intrusive' means" for accomplishing the same objectives. *Illinois v. Lafayette, supra* at 2610. Moreover, if proper inventory procedures are followed, "even some suspicion that contraband will be found will not avoid an otherwise valid inventory search." *Mooney v. State,* 243 Ga. 373, 254 S.E.2d 337, 344, *cert. denied,* 444 U.S. 886, 100 S.Ct. 179, 62 L.Ed.2d 116 (1979). However, if a purported inventory merely has masked an otherwise illegal search, the evidence obtained thereby is clearly inadmissible. *United States v. Mossbauer,* 20 U.S.C.M.A. 584, 44 C.M.R. 14 (1971).

Mil.R.Evid. 313(c), which took effect after appellant's trial, seeks to codify the precedents in this manner:

> Unlawful weapons, contraband, or other evidence of crime discovered in the process of an inventory, the primary purpose of which is administrative in nature, may be seized.... An examination made for the primary purpose of obtaining evidence for use in a trial by court-martial ... is not an inventory within the meaning of this rule.

The evidence in this case—which has been detailed at length—is clearly sufficient to sustain a finding that, in opening the suitcase, Lesnowize was conducting a lawful inventory with an administrative purpose, rather than performing a criminal investigation. Indeed, the uncontradicted testimony of Major Walke and Captain Lesnowize was that neither of them considered appellant a suspect or saw any occasion to search his personal effects. As Major Walke explained, he had no "intentions of searching ... [Law's] gear," since he did not believe that Law was "involved in ... [the] theft" of Wilson's property.

When dealing with searches performed without a warrant in reliance on the inventory exception, both federal and state courts have attached significance to the existence of and compliance with established regulations and standardized procedures for inventories. *Illinois v. Lafayette, supra; South Dakota v. Opperman, supra; United States v. Staller,* 616 F.2d 1284, 1289–90 (5th Cir.), *cert. denied,* 449 U.S. 869, 101 S.Ct. 207, 66 L.Ed.2d 89 (1980); *United States v. Dall,* 608 F.2d 910, 913–14 (1st Cir.1979), *cert. denied,* 445 U.S. 918, 100 S.Ct. 1280, 63 L.Ed.2d 603 (1980); *State v. Nelson, supra; State v. Hudson,* 390 A.2d 509, 511 (Me.1978); *Cleckley v. State,* 42 Md.App. 80, 399 A.2d 903, 905–07 (1979); *State v. McDaniel,* 156 N.J.Super. 347, 383 A.2d 1174, 1180 (App.Div.1978). Such compliance assures that the inventory is what it purports to be—rather than being merely "a pretext concealing an investigatory police motive." *See South Dakota v. Opperman, supra,* 428 U.S. at 376, 96 S.Ct. at 3100 (footnote omitted); *State v. Nelson, supra* at 637.

In the present case, there can be little doubt that Major Walke's direction for Lesnowize to perform an inventory of appellant's belongings constituted a good-faith attempt to comply with procedures and policies of his unit and of the Marine Corps. Walke testified that it was an "established" policy of the unit to inventory a soldier's gear when he was "away for any more than just a temporary period of time." This unit policy, which conformed to that of the Marine Corps,[3] had a sound basis. It protected

---

**3.** The company policy was clearly in accord with the general Marine Corps order, which, in pertinent part, provides:

> 4. *General Information*
> a. *Responsibility.* The commander is charged with the responsibility for collecting, inventorying, and placing into safe storage for ultimate disposition, the personal effects and baggage of all service members who come into any status whereby such members cannot or do not care for their own property. This includes those who die, are reported missing, are incapacitated by injury or disease, are in an unauthorized absence status, and those who for any other reason become separated from their effects.
>
> \* \* \* \* \* \*
>
> 6. *Inventory.* Whenever it is necessary to conduct an inventory of the personal effects and/or baggage of personnel in a status shown in subparagraph 4a, above, the commander will appoint a board consisting of an officer or staff noncommissioned officer to accomplish this task. This appointment may

the servicemember against loss of his property, the Government against groundless claims for property loss, and the public against dangerous items or substances that might have been left behind by the absent servicemember. *Cf. State v. Nelson, supra; United States v. Gardner,* 480 F.2d 929 (10th Cir.), *cert. denied,* 414 U.S. 977, 94 S.Ct. 297, 38 L.Ed.2d 220 (1973); *United States v. Taggart,* 334 F.Supp. 206 (D.Del. 1971).

■ Although the commander did not initiate the inventory of Law's effects until after his conversation with Agent Reno, this delay was convincingly explained by Major Walke: He simply had not been aware that appellant had left this property in his room. Likewise, there is no evidence that Lesnowize had any prosecutorial motives in entering the room and looking inside the suitcase. Instead, he had brought with him the forms customarily used in taking an inventory, and his avowed and uncontradicted purpose for entering appellant's room was "to pick up Staff Sergeant LAW's gear, get it back up to the security cage, and then get it shipped to him ... properly."

In *United States v. Mossbauer, supra,* an inventory had been used to disguise an otherwise illegal search of the accused's belongings. There, at about 5:30 a.m. on a Monday morning, the company commander learned of a report by the Provost Marshal that the accused, who had been away on weekend pass, had been arrested by civilian police for indecent exposure and possession of marihuana. Within two hours the commander had called the police station and verified the accused's arrest, but he could not "determine how long the accused would be held in custody as 'the judge had not gotten there yet to set bail.'" The commander "'assumed he was going to be there

at least several hours if not a day or more,'" so "he directed ... [his] executive officer ... to inventory the accused's gear and secure it in the supply room."

Upon performing the inventory, the executive officer decided that, "[s]ince the accused's wall locker was secured, it was necessary to cut the lock with a bolt cutter." *Id.* at 585, 44 C.M.R. at 15. After doing so, he found "[i]n the pocket of a field jacket, 'some tobacco like matter along with some cigarette papers.'" *Id.* at 585–86, 44 C.M.R. at 15–16. "Because there was a question in his mind whether the substance was in fact tobacco," the executive officer then contacted "the Criminal Investigations Detachment (CID) in order to have a positive identification made." He conceded

> on cross-examination, *that he could have been influenced into conducting a more thorough than usual inventory because of the local charges against the accused, and that he probably would not have called the CID had he been unaware that the accused was then pending civilian charges for possession of marihuana.*

*Id.* at 586, 44 C.M.R. at 16 (emphasis added). Furthermore, the executive officer "acknowledged that when he first saw the" substance in the field jacket, it only appeared to be "'ordinary tobacco.'" *Id.* While the *safeguarding* of the accused's effects was emphasized as the motivating factor behind the inventory, items of importance such as "personal papers, bills, and little notes, and stuff like that," which were also found in the same pocket as the marihuana, were not even listed on the inventory, either simply or in bulk. Moreover, we noted that:

> Here, the release of the accused depended only upon the appearance of the Justice of the Peace and the accused's ability to meet the bail requirements. He was in

be oral if the commander is satisfied that the assigned member is thoroughly cognizant of duties and responsibilities. When the effects or baggage of a commissioned officer are being inventoried, such will be accomplished by a commissioned officer.

    a. The commander will cause the personal effects and baggage to be collected and in-

ventoried and placed in safe storage immediately upon receipt of information reporting the status requiring the same, or as soon thereafter as practicable. Personal Effects Inventory, NAVMC 10154, will be used for the preparation of the inventory report.

Marine Corps Order 4050.38 (From Commandant of the Marine Corps), August 28, 1968.

fact released at 10:00 a.m. on the same day. A more complete inquiry quite likely would have revealed that eventuality. The undue alacrity with which the inventory was initiated, contrary to the standing operating procedure of the battalion (eight hours) and the usual twenty-four hour wait instituted by . . . [the company commander]; [and] the fact that those responsible for the inventory supplied themselves with bolt cutters prior to their arrival at the accused's "private" room, . . . belie the assertion that this was a routine "inventory."

*Id.* at 587, 44 C.M.R. at 17.

Unlike *Mossbauer,* where the company commander did not follow the customary inventory procedure and hastily and erroneously assumed that the accused's civilian arrest had created a need for an inventory, Law's unit commander knew that appellant had been permanently transferred from Okinawa to an installation in the United States. The company's policy, the policy of the Marine Corps, and sound practice demanded that an inventory be conducted promptly. There was no reason to delay the inventory just because it was an NIS agent—rather than some other person—who had revealed to Major Walke that Law had left some belongings in his room.

If Lesnowize, the executive officer, was acting lawfully in performing the inventory, its character was not changed by the presence of Mr. Reno. Law had terminated his occupancy of the room and had permanently departed. Therefore, he no longer retained any expectation of privacy in the room, and, insofar as he was concerned, Reno was perfectly free to enter the room whenever he chose.

The character of the inventory was not affected by Captain Lesnowize's presence earlier in Stanzuk's room while Reno made a consent search there. Indeed, no evidence refutes Lesnowize's testimony that he only accompanied Reno in order "to ensure that the rights of Lance Corporal STANZUK—as command representative, to make sure that . . . [he] was being treated fairly."

His presence thus had a benign purpose—akin to that which we have recognized favorably in a somewhat similar context. *United States v. Morrison,* 12 M.J. 272 (C.M.A.1982); *United States v. DeLeo,* 5 U.S.C.M.A. 148, 17 C.M.R. 148 (1954) (presence of American officials during search by foreign police). Furthermore, nothing in the record refutes Lesnowize's testimony that, when he opened the suitcase, he was not seeking to find evidence of a crime but was using the most feasible means to ascertain who was the owner.

■ Of course, the note signed by Law was in plain view when the suitcase was opened. Reading the note was a logical way to identify the suitcase's owner. Since the recording of serial numbers of equipment is a standard procedure in making an inventory, there is no basis for appellant to complain about the examination of the serial number of the tape player—even though it revealed information that incriminated him. Undoubtedly, at some point in the inventory of appellant's effects, the serial number of the tape player would have been determined and then would have been compared with Reno's information about the serial numbers of the stolen property. *Cf. United States v. Kozak,* 12 M.J. 389 (C.M.A. 1982).

The facts of the present case somewhat resemble those in *United States v. Kazmierczak, supra,* where, in upholding the admissibility of evidence resulting from an inventory, we remarked:

What he found in the accused's effects was not something he was looking for, or reasonably expected to find. His sole purpose was to make a list of the accused's effects and gather them together in order to store them, properly and safely. When he suddenly was confronted with the fruits of a crime, he was not bound to close his eyes to their character and seal them with the innocent articles. As Justice Frankfurter observed in *Abel v. United States,* . . ., 362 US at page 238, when an administrative officer

comes into lawful possession of criminal evidence, it is "entirely without reason to say that he must return it because it was not one of the things it was his business to look for"; on the contrary, he may turn over the evidence to the law enforcement branch of the Government.

*Id.* at 604, 37 C.M.R. at 224.

Accordingly, we hold that the inventory of the suitcase was valid.

## B

### Search of the Boxes

■ After discovery of the stolen tape player in Law's suitcase, Captain Lesnowize obviously had probable cause to authorize a search of the boxes which appellant had left in his room. However, appellant complains that Lesnowize, who had been present when Reno searched Stanzuk's room and who later had opened the suitcase, no longer possessed the required objectivity of a "neutral and detached magistrate" when he gave Reno permission to search.

If we were persuaded that Lesnowize had "been engaged in law-enforcement activities throughout his participation in the entire authorization process," the point would be well taken. *See United States v. Rivera,* 10 M.J. 55, 58 (C.M.A.1980), quoting from *United States v. Ezell,* 6 M.J. 307, 319 (C.M.A.1979). However, the evidence is uncontradicted that, in accompanying Reno to Stanzuk's room and then in proceeding to appellant's room, Lesnowize was not seeking to perform a criminal investigation. The same facts which indicate that the inventory was not merely a pretext to search help demonstrate that Lesnowize was not disqualified to authorize the search of the boxes.

Even though he remained in appellant's room while Reno performed the search, this factor is not decisive. The same considerations which explain his presence while Reno searched Stanzuk's room tend to sustain the conclusion that his presence later when the three boxes were being opened did not taint the authorization he had given Reno for the search.

This search occurred and this case was tried before *United States v. Ezell, supra,* was decided, so the opinion in that case does not govern here. Furthermore, "[u]nder *Ezell,* presence at the scene of the search is a strong factor indicating involvement in the enforcement process, but it is not automatic disqualification." *United States v. Powell,* 8 M.J. 260, 261 (C.M.A.1980).

■ Appellant also complains that the company commander, Major Walke, improperly delegated to his executive officer, Captain Lesnowize, the authority to allow this search. Of course, delegation of a commander's authority to allow a search has now been held invalid, *United States v. Kalscheuer,* 11 M.J. 373 (C.M.A.1981), but this holding post-dated the events involved in the present case and is not applicable here.

Even though the delegation was not in writing—as called for by a battalion order—we doubt that appellant can take advantage of this failure by his company commander to comply with the directive. As we pointed out in *United States v. McGraner,* 13 M.J. 408, 415 (C.M.A.1982), "not every regulation which deals with the administration of justice or with investigative procedures is designed to create rights enforceable by the accused when he is brought to trial." *See also United States v. Foust,* 17 M.J. 85 (C.M.A.1983); *United States v. Caceres,* 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979).

We need not, however, concern ourselves with the validity of the delegation, because, at the time of the search, Lesnowize was exercising command authority over the unit. Major Walke was some 27 or 28 kilometers away at a place where he could not be reached by phone. Thus, he was at least as unavailable as was the commander in *Kalscheuer,* so as acting commander— even without any express delegation—Les-

nowize was empowered to authorize the search.

## III

The tape player was discovered during a properly conducted inventory of appellant's property. The other stolen items were found by a properly authorized search of the boxes. Thus, all the challenged evidence was admissible.

The decision of the United States Navy-Marine Corps Court of Military Review is affirmed.

Judges COOK and FLETCHER concur.