UNITED STATES, Appellee,

v.

Victor BARNETT, Private First Class,
U.S. Army, Appellant.

No. 43,907.
CM 441308.

U.S. Court of Military Appeals.

July 2, 1984.

For Appellant: *Captain Peter R. Huntsman* (argued); *Colonel William G. Eckhardt, Lieutenant Colonel R. Rex Brookshire, II, Major Robert C. Rhodes* (on brief); *Major Raymond C. Ruppert.*

For Appellee: *Captain Gary L. Hoffman* (argued); *Colonel R. R. Boller, Lieutenant Colonel John T. Edwards, Captain Thomas E. Booth* (on brief); *Major Michael L. DeBusk, Captain Kenneth H. Clevenger.*

*Opinion of the Court*

EVERETT, Chief Judge:

Appellant was tried at Fort Lewis, Washington, by general court-martial composed of officer members. Contrary to his pleas, he was found guilty of three robberies, an aggravated assault, and wrongful alteration of a military identification card, in violation of Articles 122, 128, and 134 of the Uniform Code of Military Justice, 10 U.S.C. §§ 922, 928, and 934, respectively. The sentence adjudged was a dishonorable discharge, confinement for 10 years, forfeiture of all pay and allowances, and reduction to the lowest enlisted grade. The convening authority approved the findings and sentence; and the United States Army Court of Military Review affirmed without opinion. This Court granted Barnett's petition for review on this issue:

WHETHER UNDER THE PRETEXT OF AN INVENTORY GOVERNMENT AGENTS CONDUCTED AN ILLEGAL SEARCH OF THE ACCUSED'S PERSONAL EFFECTS.

I

After arraignment, appellant moved "to suppress any items found during a pretrial confinement inventory conducted on the 23rd of January 1981." According to defense counsel, the presence of law enforcement agents during the inventory revealed that it was only a pretext to search for evidence of crime.

In resisting this motion, trial counsel first requested that there be appended to the record the provisions of an Army Regulation pertaining to the inventory of a sol-

dier's clothing when he is placed in pretrial confinement.[1]

Then the Government called to the stand Sergeant First Class Wayne Michael Kotila, a member of appellant's battery, who, on January 23, 1981, inventoried appellant's equipment at the direction of "[t]he First Sergeant and Battery Commander." Kotila "was told to call up CID, that they wanted to be present during the inventory. I called them up, they came and we went upstairs to perform the inventory." According to the witness, he had performed "a normal inventory for pretrial confinement"; and two CID Agents "stood by and if they wanted to see any certain items, they would request to see it." The battery commander had told Kotila "to call CID and let them know that the inventory is being held this morning." Then Kotila testified:

> I called them up and said: We're going to inventory PFC Barnett's equipment. I believe you wanted to be present. I waited for them to come and then when they came we started.

Earlier he pointed out, "There was [sic] four inventories going on at the same time within the battery." In fact, First Sergeant Vanover was inventorying the property of appellant's roommate, Private Carter, who also had been confined. However, according to Kotila, the two CID agents only observed the inventory of Barnett's property and did not watch the other inventories.

In making the inventory, Kotila "went through each item and called it off, like, six civilian shirts or something like this. Then the recorder wrote it down"; and also he noted where each item had been found. When Kotila picked up a stereo, he "felt something under there" "on the back edge... So I looked, and there was [sic] ID cards there."

The witness insisted that this "was a normal inventory just like as if he was going on leave." However, he did say, "The only difference would have been, if he was going on leave, he would have been there during the inventory." Kotila denied that the inventory was "any more detailed because CID was there" or that he had paid extra attention to any particular item. "The CID asked to see a few items, that was all."

Kotila identified Defense Exhibit A as "a list of items found in PFC Barnett's room that day"; and the list included "a numchuck, several different IDs and then personal clothing." One of the identification cards had been found underneath "a little tray in" a tool box; and Kotila asserted that if he had been "conducting an inventory for someone who was going on leave," he would have opened the box and noticed the identification card in the bottom.

Captain Alvin Thomas, appellant's battery commander, testified that he had placed appellant in confinement on January 22—the day before the inventory. "[A] couple days prior to that," CID Agents "asked that Barnett and others be made available to them on the date which they planned to pick them up, that date being the 22nd." Once Thomas had decided to place Barnett, Carter, and two other soldiers in pretrial confinement, the CID Agents "requested that if and when I decided to have an inventory conducted of these individuals' property, they would like to be present during that inventory."

On January 23rd, Captain Thomas ordered that a pretrial confinement inventory be made of Barnett's property; and he had "advised Sergeant Kotila, who was conducting this particular person's inventory, to advise the CID that we were in the process of conducting the inventory, at their request."[2] Captain Thomas gave Ko-

1. Para. 12–8(c), Army Regulation 700–84, Issue and Sale of Personal Clothing, February 15, 1980.

2. Appellate defense counsel apparently interpret the words "at their request" to mean that the CID had requested the inventory. Instead, it seems clear from the context that the phrase referred to the CID request to be advised when the inventory would take place.

tila no "special instructions" "other than ... to advise CID that we were going to conduct it at this particular point." Captain Thomas decided to have the inventory performed on January 23, because

> the training schedule allowed me to have NCOs available. Because of the number of people being put into pretrial that particular—that preceding day, I had to have at least four or five NCOs available to conduct the inventory. My training schedule at that particular time allowed me to do that.

After the inventory had been performed, the CID agents came to Captain Thomas "and asked if they could do a thorough search of ... [appellant's] property." After swearing in the agents, Captain Thomas "allowed them to do a thorough search."

When appellant, Carter, and the other two soldiers were placed in pretrial confinement the day before the inventory, all had been charged with "basically the same offenses"—"basically, robberies and larcenies." The CID Agents had asked "to be advised when the inventories were to be conducted on these individuals—Barnett." Captain Thomas had Kotila make the call, rather than the first sergeant or someone else, because, as he explained:

> There were four people being inventoried. Sergeant Kotila was the one that was inventorying Barnett's stuff. Okay, because he was conducting the inventory on Barnett's stuff, I advised him to call.

At the time of the inventory, Captain Thomas was aware that Barnett was suspected of several offenses. Thomas thought the CID agents wished to be present during the inventory in order to obtain "[a]dditional evidence for use at trial." However, Captain Thomas asserted that his own "primary reason" for the inventory was

> because of the regulation, he was going to be out of the area. I looked at him as an absentee-type of individual and his inventory must be conducted for security purposes.

After the battery commander testified, the defense offered in evidence a one-page Agent's Investigation Report prepared by CID Special Agent Anthony O. Warrington. According to this report, Warrington had been notified by Sergeant Kotila at about 7:30 a.m. on January 23, 1981, "that a pre-trial inventory of rooms assigned to BARNETT, COBB, CARTER and MARSHALL were [sic] scheduled to be conducted at" 9:00 a.m. At about 8:30 a.m., Warrington and Special Agent Brunner had "arrived and apprised CPT Thomas ... of the investigation to date." About 9:00 a.m., the inventory of the room assigned to appellant and Carter was begun. "[I]n varying locations of living space assigned to" appellant, some "[a]ltered and partially obliterated ID cards, which did not appear to belong to BARNETT," were found. During the inventory, an identification "card which appeared to have BARNETT's picture" with "another soldier's signature on it" was discovered along with "various identification type cards belonging to other soldiers; a coin collection, which was suspected to [be] that stolen in a downtown Tacoma, WA Robbery"; as well as watches; stereo cassette decks; and components of stereo equipment. "As unit personnel located these and other items," Warrington "made note of their location and the items were later seized as evidence." The report continued: "Before the inventory of BARNETT and CARTER's personal belongings and assigned military belongings were [sic] completed, based on the evidence already discovered," Warrington "obtained verbal authorization by CPT THOMAS to search the other areas of the room (under the beds, behind wall lockers, under desk drawers, etc.)."

Arguing in support of his motion to suppress, defense counsel relied on the language of Mil.R.Evid. 313(c) that:

> An examination made for the primary purpose of obtaining evidence for use in a trial by court-martial or in other disciplinary proceedings is not an inventory within the meaning of this rule.

While the defense conceded that the inventory was "legitimately based in that there is a regulation that requires it," they con-

tended that "there was a lack of good faith and it clearly acts as a subterfuge for a search."

In reply, trial counsel insisted that there had been "a properly conducted pretrial confinement inventory, and as such, any evidence obtained as a result of this is admissible." He first noted that, according to the Drafter's Analysis, Appendix 18, Manual for Courts-Martial, United States, 1969 (Revised edition), p. A18–39, "Rule 313(b) makes it clear that an otherwise valid inspection is not rendered invalid solely because the inspector has as his or her purpose a *secondary* 'purpose of obtaining evidence for use in a trial by court-martial or in other disciplinary proceedings.'" From this he reasoned that similarly a commander may lawfully order an inventory even though he has "the securing of evidence of crime" as "a secondary purpose."

The judge's ruling on the motion to suppress was:

The Court finds that the items found are items discovered in the process of an inventory conducted pursuant to law and regulation for the primary purpose of securing such items while the Accused was in pretrial confinement.

This ruling, of course, gave rise to the present appeal.

## II

In *United States v. Law*, 17 M.J. 229 (C.M.A. 1984), we dealt with the admissibility of evidence seized as the result of an inventory of property of a Marine who had been reassigned to a distant command. We explained that such evidence could be properly received, so long as the inventory was not a subterfuge search. *See, e.g., United States v. Mossbauer*, 20 U.S.C.M.A. 584, 44 C.M.R. 14 (1971). Although Barnett's absence from his unit was occasioned by pretrial confinement—rather than by reassignment—the *Law* rationale is fully applicable here. Indeed, in *Law* we relied on a recent Supreme Court decision upholding the reception of evidence found during an inventory of the effects of a person being placed in pretrial confinement. *Illinois v. Lafayette*, 462 U.S. 640, ___, 103 S.Ct. 2605, 2608, 77 L.Ed.2d 65, 69 (1983).

In *Law*, both the commander who authorized the search and the officer who performed it denied emphatically that they possessed any suspicion that the accused was guilty of a crime. Thus, the primary purpose—indeed, the sole purpose—of the inventory was to comply with Marine Corps regulations and with unit directives which required that the property of an absent servicemember be promptly inventoried, both for his protection and for that of the Government. On the other hand, here Captain Thomas, who had made the decision to place Barnett in confinement, certainly had no belief in appellant's innocence. Although the evidence is sufficient to sustain the judge's finding that the commander's "primary purpose" was to secure appellant's property while he was in pretrial confinement, clearly "a secondary purpose" was to determine if any evidence of crime was contained in Barnett's belongings.

Mil.R.Evid. 313(c) declares that an examination "for the primary purpose of obtaining evidence for use in a trial by court-martial or in other disciplinary proceedings is not an inventory." This language contains a negative implication that, if the examiner's purpose to obtain evidence is *not* "primary," the inventory is untainted. The Drafters' Analysis of Rule 313(b)—which has language identical to that of Rule 313(c)—tends to support this interpretation.

Furthermore, the case law does not indicate that the results of an inventory will be inadmissible in evidence when the inventory has been performed by someone whose "secondary purpose" was to seek evidence of crime. As this Court has remarked, "[I]f proper inventory procedures are followed, 'even some suspicion that contraband will be found will not avoid an otherwise valid inventory search.'" *United States v. Law, supra* at 237, citing *Mooney v. State*, 243 Ga. 373, 254 S.E.2d 337, 344, *cert. denied*, 444 U.S. 886, 100 S.Ct. 179, 62 L.Ed.2d 116 (1979). In sustaining the admissibility of evidence located during an

inventory of the contents of the wallets of two persons searched incident to their arrest for various drug offenses, the North Dakota Supreme Court commented in *State v. Lind*, 322 N.W.2d 826 (N.D. 1982):

> We do not believe that the resultant seizure of documents from the wallets of Carroll and Lind was unreasonable because the drug-enforcement agent had a dual purpose. It is sufficient that the wallets were being inventoried. After the drug-enforcement agent testified the search was an inventory search no evidence was presented to indicate that inventorying the wallets of arrested persons at the Grand Forks County jail was not a standard jailhouse procedure. The inventory search being reasonable, we cannot agree that incriminating evidence discovered as a result must be suppressed. Had the jailer alone found obvious evidence of an illegality such as contraband, we cannot expect that he or the State should ignore it solely because it was found during an inventory. Because someone was present who recognized contents of the wallets as being relevant to the arrests while assisting the jailer does not require the suppression of the documents seized.

322 N.W.2d at 835–36. When an arrested suspect is searched at a jail in order to inventory his personal property, frequently those performing the inventory will believe it quite likely that evidence of crime will be located. This likelihood does not affect the lawfulness of the inventory. Thus, even though Captain Thomas may have expected that stolen property would be found among appellant's effects, we see no reason why this should affect admissibility here.

In *United States v. Law, supra*, we emphasized that the inventory was performed pursuant to regulations of the Marine Corps. The Army Regulation on which trial counsel relied in the present case dealt with inventories of clothing and, on its face, might not seem to encompass some of Kotila's inventory of appellant's property. However, defense counsel apparently did not dispute that the inventory was performed pursuant to military regulations. Moreover, we note that inventories were made of the property of the three other members of appellant's battery who had been placed in pretrial confinement at the same time; and this procedure was followed even though the CID Agents made no effort to observe those inventories. Thus, it seems clear that, as testified by the government witnesses, the inventory was a standard procedure of appellant's battery and was performed pursuant to military regulations and customs. Indeed, in the present case, there was a special need to secure appellant's property, since not only he but also his roommate, Carter, had been placed in pretrial confinement, and there was no one still living in the room who could protect their personal property.

In *Law*, a criminal investigator was present while the inventory was being performed. However, Law had been permanently reassigned from his room in the barracks, so he had no standing to object to the agent's presence. Here, on the other hand, Barnett presumably would return to the same room whenever he was released from pretrial confinement. However, this circumstance does not dictate a different result. Appellant would reasonably have expected that, in the event of pretrial confinement for any appreciable period of time,[3] his property would be inventoried and his room would be made available for use by others. Therefore, the presence of criminal investigators was not such a deviation from what appellant reasonably would have expected as to dictate the conclusion that his Fourth Amendment rights were violated. Thus, the presence of the two CID agents during an otherwise lawful inventory of appellant's property did not transmute the inventory into an unreasonable search and seizure.

**3.** In this instance, the pretrial confinement extended for several months.

### III

Because the evidence of record supports the military judge's finding that the "primary purpose" of the inventory was to secure appellant's property, we must hold that the inventory was not a subterfuge search, so it was lawful. Therefore, the evidence located by reason of the inventory was admissible.

The decision of the United States Army Court of Military Review is affirmed.

Judge FLETCHER and Senior Judge COOK concur.