*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
HUTCHISON, TANG, and LAWRENCE,
Appellate Military Judges

_____

**UNITED STATES**
Appellee

**v.**

**Roberto ARMENDARIZ**
Master Sergeant (E-8), U.S. Marine Corps
Appellant

**No. 201700338**

Argued: 11 March 2019—Decided: 22 May 2019

Appeal from the United States Navy-Marine Corps Trial Judiciary. Military Judges: Colonel Matthew J. Kent (arraignment); Lieutenant Colonel Brian E. Kasprzyk, USMCR (motions); Lieutenant Colonel Mark Sameit, USMC (trial). Sentence adjudged 24 July 2017 by a general court-martial convened at Marine Corps Air Station Miramar, California, consisting of officer and enlisted members. Sentence approved by convening authority: confinement for 18 months and a dishonorable discharge.

For Appellant: Tami L. Mitchell, Esq. (argued); David P. Sheldon, Esq. (on brief); Lieutenant Clifton E. Morgan III, JAGC, USN (on brief).

For Appellee: Captain William J. Mossor, USMC (argued); Major Kelli A. O'Neil, USMC (on brief); Lieutenant Kimberly Rios, JAGC, USN (on brief).

Judge TANG delivered the opinion of the Court, in which Senior Judge HUTCHISON and Judge LAWRENCE joined.

———————————————

## PUBLISHED OPINION OF THE COURT

———————————————

TANG, Judge:

The appellant was convicted, contrary to his pleas, of two specifications of violating a lawful general regulation, one specification of sexual assault by bodily harm, one specification of sexual contact by bodily harm, and one specification of adultery in violation of Articles 92, 120, and 134, UCMJ, 10 U.S.C. § 892, 920, 934 (2012).

The appellant raises and fully briefs nine assignments of error (AOEs): (1) the evidence is legally and factually insufficient; (2) the military judge abused his discretion in denying a motion to suppress evidence seized from the appellant's body, property, and workspace;[1] (3) trial defense counsel were ineffective in several regards during the merits phase of trial; (4) the military judge abused his discretion in admitting evidence to show consciousness of guilt; (5) the military judge improperly allowed trial counsel to argue the appellant made a false exculpatory statement; (6) the military judge erred by refusing to instruct the members on a defense-requested adverse inference; (7) the trial counsel committed prosecutorial misconduct; (8) the trial defense counsel were ineffective during the sentencing phase of trial; and (9) the sentence is inappropriately severe. Additionally, he asserts, without briefing, five summary AOEs, none of which have merit. We find merit in AOE 2 and take the appropriate corrective action in our decretal paragraph.

## I. BACKGROUND

### A. The Alleged Misconduct

The appellant was assigned to Marine Wing Support Squadron 373 (MWSS-373), Marine Air Group 11 (MAG-11), 3d Marine Air Wing (3d MAW) and stationed at Marine Corps Air Station (MCAS) Miramar, California. The appellant and the victim, Sergeant N, served together in MWSS-373 during a prior tour of duty. When Sergeant N reported for a second tour of

---

[1] On appeal the appellant avers several bases justify suppression of the evidence. Only two bases were litigated at trial. "[A]rguments for suppression of evidence under M.R.E. 311 that are not made at trial are waived." *United States v. Perkins,* No. 18-0365, 2019 CAAF LEXIS 290 at *21 (C.A.A.F. April 23, 2019).

duty at MWSS-373 in June 2016, the appellant was the acting sergeant major. Because Sergeant N knew the appellant from their prior tour at MWSS-373, they exchanged personal cell phone numbers. After that point, they maintained regular, friendly text message communication. By 25 July 2016, the appellant was no longer the acting sergeant major.

On 25 July 2016, before 0800, Sergeant N texted the appellant asking "Are you alive?!" and noted that she had not seen the appellant for about a week.[2] The appellant texted and then called Sergeant N. During that call, Sergeant N asked the appellant if he would roll the sleeves on her uniform blouse because she did not want to do so. The appellant agreed. He met Sergeant N outside of the squadron building where he had a private office. Both the appellant and Sergeant N were wearing physical training clothing consisting of shorts and T-shirts.

To reach the appellant's office, the appellant and Sergeant N walked through an open conference room with a large conference table. The appellant's office opened up to that conference room. When the appellant and Sergeant N passed through the conference room, it was approximately 0800, and a group of personnel from the unit were gathering for a morning meeting. The appellant and Sergeant N went into his office. The door was closed and the lights were on. The appellant began rolling the sleeves on Sergeant N's uniform blouse, and they made small talk about their lives, future plans, and clubs in San Diego.

Sergeant N and the appellant also talked about a time they had had consensual sex years ago during their prior tour together. In response to the appellant's reference to their prior consensual sexual encounter, Sergeant N laughed, said she remembered, and said that she did not want to "mess" up her hair and that people would hear them if they were to have sex in the appellant's office.

Sergeant N testified that the appellant locked the office door and turned off the lights. Then he laid her back on his couch and pushed aside her shorts, the liner of her shorts, and her underwear. According to Sergeant N, the appellant then digitally penetrated her vulva without her consent.[3] She told him to stop and that she didn't "want people to hear."[4] Then the appellant took off his shorts and underwear and penetrated her vulva with his penis for

---

[2] Prosecution Exhibit (PE) 11 at 10.

[3] The appellant was acquitted of this offense.

[4] Record at 473.

a short amount of time.[5] Her clothing remained on but pulled to the side. When Sergeant N said, "I'm not [f***ing] kidding. I don't want to do this,"[6] the appellant stopped and dressed himself. Sergeant N testified that after the appellant dressed himself, he commented on her breasts and touched her breasts underneath her shirt without her consent.[7]

Sergeant N remained in the appellant's office for another 10-15 minutes, changed into her uniform when the appellant stepped outside to take a call on his cell phone, and thereafter went to work.

During her lunch break, Sergeant N called a fellow Marine and former MWSS-373 command member, First Sergeant L. She told First Sergeant L that the appellant sexually assaulted her. Sergeant N did not want to report the sexual assault. Against her wishes, First Sergeant L called 911 and reported the assault. As a result of First Sergeant L's report, agents of the Naval Criminal Investigative Service (NCIS) contacted Sergeant N, who cooperated with NCIS, made a statement describing the sexual assault, and submitted to a sexual assault forensic examination (SAFE). She told the agents she communicated with the appellant by cell phone, and she provided the specific cell phone number that the appellant used to communicate with her.

## B. Searches Authorized by the "Acting" Commanding Officer

Special Agent P was a Marine Corps Criminal Investigative Division agent assigned to NCIS as a Marine Special Agent. Special Agent P prepared several Command Authorizations for Search and Seizure requesting authority to search for evidence of the alleged sexual assault of Sergeant N. At the time of the searches, the Commanding Officer of MWSS-373, Lieutenant Colonel W, was deployed with a majority of the squadron. Before deploying, he signed a letter delegating "acting" and signature authority to Major B, the unit's Executive Officer, and he referred to her as the Officer in Charge and Acting Commanding Officer of the portion of MWSS-373 that remained in Miramar.

Special Agent P requested, and Major B authorized, a total of three searches. On 25 July 2016, the day of the sexual assault, Special Agent P requested to search the appellant's cell phone, office, vehicles, and his body. Also on 25 July 2016, Special Agent P orally requested and received authoriza-

---

[5] This act formed the basis of the sexual assault conviction. *See* Charge Sheet.

[6] Record at 475.

[7] This act formed the basis of the sexual contact conviction. *See* Charge Sheet.

tion to seize a cell phone from the appellant's vehicle, wherein he seized two cell phones. Special Agent P later drafted a document he titled a "verbal affidavit" to memorialize the conversation in which Major B orally granted search authority.

On 26 July 2016, a witness statement suggested that the appellant deliberately hid an Apple iPhone with a cracked screen off-base when he was ordered—without explanation—to return to MCAS Miramar the day before. Based on this witness statement, Special Agent P requested and received a third search authorization, to seize the cracked-screen iPhone. But instead of finding the cracked-screen iPhone, agents found and seized a Samsung Galaxy SIII phone.

As a result of the three search authorizations, agents seized three cell phones. One phone seized on 25 July was password-protected and not subjected to analysis; the other yielded no relevant evidence as it had not been used since 2013. The Samsung Galaxy SIII phone was either new or had been "reset to factory settings."[8] The Samsung Galaxy SIII was the only phone from which evidence was presented at trial.

In addition to seizing the appellant's cell phones, agents seized items of clothing from a wall locker in the appellant's office. The search authorizations compelled the appellant to submit to a SAFE. A sexual assault examiner inspected the appellant's body, swabbed the appellant's genitalia, and swabbed the appellant's cheek to collect his DNA. The DNA evidence was tested by the U.S. Army Criminal Investigations Laboratory (USACIL). As a result of this testing, the government concluded that Sergeant N's DNA was likely present in the inside crotch of the appellant's underwear and that DNA belonging to the appellant was likely found on Sergeant N's external genitalia and the inside crotch of her underwear.[9] This DNA evidence was admitted at trial.

---

[8] Record at 553.

[9] The DNA report, admitted as PE 8, indicated that a mixed DNA profile found on the appellant's inside crotch was "at least 1.9 quadrillion times more likely if it originated from [the appellant] and [Sergeant N] than if it originated from [the appellant] and an unknown individual." The report further indicated that the appellant and "his paternal male relatives cannot be excluded from the partial Y-STR DNA profile obtained" from Sergeant N's underwear and external genitalia. The report specified that there was a 1:610, 1:540, and 1:810 probability of "randomly selecting a male individual with this profile" from the "Caucasian", "Black", and "Hispanic" profile groups, respectively, matching the profile found in Sergeant N's underwear. The comparable statistic for the profile found on Sergeant N's external genitalia was 1:130, 1:130, and 1:140 for the same profile groups. PE 8 at 2-3.

On 29 August 2016, in an unrelated case tried in the same circuit, a defense counsel contested Major B's authority as "acting" commanding officer in relation to her referral of charges to court-martial. Major B testified in that case. At some point after 12 September 2016, the new case agent, Special Agent B asked NCIS cyber agents and USACIL analysts to pause their search of the evidence seized as a result of the 25 and 26 July 2016 search authorizations. After Lieutenant Colonel W returned from deployment, Special Agent B, presented him with a request for authorization to seize and search the exact same property that Special Agent P seized months prior. On 18 November 2016, Lieutenant Colonel W granted that request. No new evidence was seized. The record does not indicate the extent of search efforts that preceded the 18 November 2016 resumption of searches.

## C. The Motion to Suppress Evidence

The trial defense counsel moved the court to suppress the results of the 25 and 26 July 2016 searches. The trial defense counsel argued two grounds justified suppression: (1) that Major B lacked the authority to approve search authorizations because she was not a commander; and (2) that the search authorizations were not based on probable cause because the government failed to disclose the affidavits used to justify probable cause. In the government's response, the trial counsel disclosed the affidavits that related to the three search authorizations that Major B approved on 25 and 26 July 2016.

During an Article 39(a) pre-trial motion session, the government presented the testimony of Lieutenant Colonel W, Major B, and NCIS Special Agent E, who first interviewed Sergeant N. Special Agent P testified on the merits at trial, but he was not called to testify in relation to the defense motion to suppress evidence.

Testimony established that MWSS-373 reported to Marine Aircraft Group 11 (MAG-11), which in turn reported to the Third Marine Aircraft Wing (MAW).

The government presented a letter Lieutenant Colonel W signed to "delegate[ ] the authority to sign 'Acting' in the capacity of the Commanding Officer" of MWSS-373 to Major B.[10] The subject line reads, "Delegation of 'Acting' and Signature Authority." The letter refers to Article 1026, United States Navy Regulations (1990), and Secretary of the Navy Instruction 5216, the Navy Correspondence Manual.[11] The letter states that the Commanding

---

[10] Appellate Exhibit (AE) IX at 20.

[11] *Id.*

Officer's responsibilities "will absent him from the command for extended periods of time," which "necessitates the requirements for delegation of authority."[12] Accordingly, he stated his "Commander's Intent" that the "executive [sic] Officer will have the need to sign official correspondence and all documents on the Commanding Officer's behalf as 'Acting.'"[13] The letter then indicated the exact signature block that Major B was required to use.

Lieutenant Colonel W testified that he deployed to Bahrain, Iraq, Jordan, and Kuwait with over 300 members of his unit in March 2016. Approximately 200 members of MWSS-373 remained behind at MCAS Miramar. He referred to the non-deployed Marines of MWSS-373 as a "Remain Behind Element," or RBE.[14] He testified that he gave Major B "full authorities as the commanding officer" to "make decisions in [his] stead," and that he expected her to make decisions and to "back brief" him later.[15] He delegated authority for Major B to sign correspondence as the acting Commanding Officer "on administrative related matters."[16] While Lieutenant Colonel W was deployed, the RBE continued to provide support to MAG-11, and the commander of MAG-11 tasked Major B directly.

On cross-examination, Lieutenant Colonel W testified that he did not delegate authority for Major B to impose nonjudicial punishment (NJP), nor did she have authority to convene courts-martial. Further, Lieutenant Colonel W testified that the RBE was not formally established as a separate unit, and both the deployed and remain-behind elements remained part of MWSS-373 under his command at all times. He referred to Major B as the Officer in Charge, or OIC, of the RBE. On 25 and 26 July 2016, when Major B signed the search authorizations, Lieutenant Colonel W was in Kuwait, where he had an office and regular access to phone, internet, and email. He used those communication methods to maintain contact with Major B, who provided "back brief[s]" so that Lieutenant Colonel W maintained awareness of the RBE's status.[17] He did not formalize Major B's status as an OIC with the Secretary of the Navy, although he did inform the commanding officer of MAG-

---

[12] *Id.*

[13] *Id.*

[14] Record at 19.

[15] *Id.*

[16] *Id.*

[17] *Id.*

11, his direct superior, of his intention for Major B to "make decisions in [his] stead."[18]

Major B testified that she was the OIC and "acting commander" of the RBE.[19] She signed correspondence typically reserved for the commanding officer's signature, such as re-enlistment contracts, administrative separation documents, and end-of-tour awards. She believed she had authority to sign search authorizations and that she exercised authority consistent with that of an "OIC of a detachment," which is what she believed "the [RBE] was."[20] She testified that the reorganization of MWSS-373 was done internally, and not by seeking recognition of an OIC by the Secretary of the Navy.

In a written ruling, the military judge denied the defense motion to suppress the evidence. He held that Major B could properly authorize the searches.

Additional facts necessary for resolution of the AOEs are included in the discussion below.

## II. DISCUSSION

### A. The Military Judge Erred in Denying the Defense Motion to Suppress Evidence

#### 1. The legal standard of review

We review a military judge's ruling on a motion to suppress evidence for an abuse of discretion. *United States v. Keefauver,* 74 M.J. 230, 233 (C.A.A.F. 2015). We are bound by the military judge's findings of fact unless they are clearly erroneous, but we conduct a *de novo* review of conclusions of law. *Id.* "[W]e consider the evidence in the light most favorable to the prevailing party." *Id.* (alteration in original).

#### 2. The military judge's findings of fact

In a 26 May 2017 Article 39(s) motions hearing, the military judge received evidence in the form of testimony and documents. He issued a ruling in an email on 16 June 2017, stating, "The defense motion to suppress

---

[18] *Id.* at 24.

[19] *Id.* at 26.

[20] *Id.* at 30.

(AE-VIII) is denied."[21] A different military judge presided over the trial. Following trial on the merits, but before the record was authenticated, on 16 August 2017, the military judge who presided over the motions hearing issued a written ruling which was appended to the record as Appellate Exhibit (AE) LI.

In his ruling, the military judge made findings of fact, several of which we discuss below.

The military judge found that Major B "was the Officer-in-Charge of the [RBE]" of MWSS-373.[22] In accepting the nomenclature used by Lieutenant Colonel W and Major B, the military judge did not apply the UCMJ definitions pertinent to the term "Officer in Charge."

Based on inconsistent witness testimony, the military judge made findings of fact that were, likewise, contradictory and erroneous. Lieutenant Colonel W testified that he intended Major B to have "full authorities as the commanding officer" and for her to "make decisions in [the commanding officer's] stead."[23] But Lieutenant Colonel W also testified that he had withheld from Major B the authority to impose nonjudicial punishment or to convene courts-martial—authorities that only he would exercise.

Consistent with the witness's testimony, the military judge found that Lieutenant Colonel W intended for Major B to exercise "full authorities" and to "make all the decisions normally reserved to the commanding officer."[24] But he also found as fact, consistent with witness testimony that "[t]here were limits to [Major B's] authority as acting commanding officer," noting that she lacked authority to impose nonjudicial punishment and to convene courts.[25] Though both findings correctly recited the witness's testimony, the military judge failed to reconcile the inconsistency between the witness's intentions and the legal status of a commanding officer.

The military judge found that Major B was "responsible for supervising the company commanders of MWSS-373 and reported directly to the MAG-11 Commanding Officer."[26] This finding of fact is incomplete. Although Major B

---

[21] AE XVII.

[22] AE LI at 4 (finding 26).

[23] Record at 19.

[24] AE LI at 5 (findings 28-29).

[25] *Id.* at 5 (finding 36).

[26] *Id.* at 5 (finding 30).

received tasking from the MAG-11 Commanding Officer, Lieutenant Colonel W remained *her* Commanding Officer and remained her reporting senior for fitness report purposes.

The military judge found that "[w]ith the deployment of [Lieutenant Colonel W] and the [forward deployed element], MWSS-373 was effectively split into two organizations."[27] He further found that MWSS-373 was divided "in such a way as to operate as two organizations."[28] In so finding, the military judge did not apply any of the rules or regulations that govern the establishment of military units within the Department of the Navy. The military judge did not account for the fact that Lieutenant Colonel W did not seek authorization from any person with competent authority to establish an RBE that would function as a *separate* unit.[29]

The military judge also found that "the MWSS-373 RBE functioned in substantially the same manner as it did prior to the FDE's [forward deployed element's] departure."[30] This finding of fact is clearly erroneous. Lieutenant Colonel W testified that he sought to elevate Major B to a position of OIC and acting commanding officer *because* he knew the unit could not function in the same manner as it did while he was present. Major B did not step into Lieutenant Colonel W's shoes and fully assume command. She still regularly informed Lieutenant Colonel W of the unit's work, and at all times, Lieutenant Colonel W remained the commanding officer and actively commanded the entirety of MWSS-373.

*3. De novo review*

a. Legal authority to authorize searches

Under MIL. R. EVID. 315(d)(1), a search authorization may be authorized by a:

> Commander or other person serving in a position designated by the Secretary concerned as either a position analogous to an officer in charge or a position of command, who has control over the place where the property or person to be searched is situat-

---

[27] *Id.* at 10. Although listed under the "Conclusions of Law," this is a finding of fact.

[28] *Id.*

[29] *See* U.S. Navy Regulations, Arts. 0722-0723 (1990), further discussed below.

[30] *Id.* at 11.

ed or found, or, if that place is not under military control, having control over persons subject to military law.

RULE FOR COURTS-MARTIAL 103(5), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2016 ed.), defines "*commander*" as "a commissioned officer in command or an officer in charge except in Part V [pertaining to nonjudicial punishment] or unless the context indicates otherwise." "*Officer in charge*" means a "member of . . . the Marine Corps . . . designated as such by appropriate authority." Article 1(4), UCMJ.

Two Court of Military Appeals precedents apply. They stand for the binary proposition that Lieutenant Colonel W either impermissibly *delegated* his authority to approve search authorizations to Major B, or command authority automatically *devolved* to Major B because of Lieutenant Colonel W's absence from the command, in which case Major B had authority to approve searches.

In *United States v. Kalscheuer,* 11 M.J. 373 (C.M.A. 1981), the court evaluated a search authorization approved by a deputy base commander. The base commander specifically delegated authority to authorize searches. *Id.* at 374. Following a change of command, the new base commander did not specifically delegate this authority. *Id.* Agents sought a search authorization, but the commander was off-base touring satellite installations "a few kilometers" away, and the commander had left behind his two-way radio. *Id.* No attempt was made to reach the commander, and the deputy base commander authorized a search. *Id.*

The C.M.A. rejected the government's argument—supported in the 1969 MANUAL FOR COURTS-MARTIAL—that "it is quite reasonable to allow busy commanders to delegate to some neutral and detached person the authority to order searches." *Id.* at 375. The court held that just as neither nonjudicial punishment authority nor court-martial authority can be delegated, the authority to search, likewise, cannot be delegated. *Id.* at 376. The court emphasized that there are some decisions that are so important that they must be made by the commander personally, such as the "delicate [and] vital . . . decisions whether to interfere with service members' privacy by allowing searches and seizures." *Id.* at 378. In conclusion, the court held, "A search performed by permission of a commander's delegee—other than a military judge or magistrate—does not meet the *Fourth Amendment* requirements of reasonableness." *Id.* at 378.

However, the court still affirmed the propriety of the search in *Kalscheuer*, holding that authority as commander devolved to the deputy base commander by virtue of the commander's absence. *Id.* at 377. The court cited "military regulations [and] customs" which provide a "command hierarchy" for a deputy to "act[ ] in the commander's stead when he is absent or otherwise unavailable." *Id.* The court held the deputy "acted as commander" in the

commander's absence, meaning he had the same authority to authorize searches as the commander because the deputy had "assumed command responsibilities" and this authority "exist[ed] apart from any formal delegation." *Id.*

The C.M.A. reiterated the distinction between impermissible delegation and permissible devolution in *United States v. Law,* 17 M.J. 229 (C.M.A. 1984). In *Law,* the commander testified that he delegated authority for his executive officer to authorize searches in his absence. *Id.* at 234. The commander attended a play rehearsal "some 27 or 28 kilometers" away from his unit, where there was no phone. *Id.* In the commander's absence, the executive officer authorized a search. The court noted, "Of course, delegation of a commander's authority to allow a search has now been held invalid." *Id.* at 240, (citing *Kalscheuer*, 11 M.J. at 373). Although the commander had delegated authority, the court held that "at the time of the search, [the executive officer] was exercising command authority over the unit" by virtue of the commander's absence and lack of communication abilities. *Id.*

In *Kalscheuer,* the court looked to service regulations in determining the authorities of a commanding officer. We will do the same, first looking to the U.S. Navy Regulations.

### b. Service regulations defining "commander"

U.S. Navy Regulations, Art. 1026 (1990), recognizes that an officer may "succeed[ ] to command" in the absence of the commanding officer due to "incapacity, death, departure on leave, detachment without relief or absence due to orders from competent authority." The officer who succeeds to command "has the same authority and responsibility as the officer whom he or she succeeds."[31]

U.S. Navy Regulations, Art. 0722 states that a "commander may designate an officer of the staff to act as the commanding officer" of enlisted persons when it is not practicable to assign them to an established activity for administration and discipline. In similar fashion, U.S. Navy Regulations, Art. 0723 permits certain officers to designate *in writing* "organizations which are separate or detached commands."[32] In both instances, the commander making the designation must notify the Judge Advocate General and, for U.S. Navy Regulations, Art. 0722 designations, the Commandant of the

---

[31] U.S. Navy Regulations Art. 1026 Para. 2.

[32] Those officers are flag and general officers in command, officers exercising general court-martial convening authority, and the senior officer present.

Marine Corps. In both cases, the designated commanding officer or OIC may be granted court-martial convening authority only if specifically permitted by the Secretary of the Navy upon a request by the Judge Advocate General.

Through the Manual of the Judge Advocate General,[33] (JAGMAN), the Judge Advocate General, by authority of the Secretary of the Navy, issued regulations implementing and supplementing the MCM. In JAGMAN § 0120, the Secretary specifically designated additional convening authorities. Pertinent to discussion of this case, JAGMAN § 0120 grants special court-martial convening authority to commanding officers of Marine Corps squadrons. JAGMAN § 0121 contains the procedure to request court-martial convening authority for designated commanders and OICs of a "separate and detached unit" created by U.S. Navy Regulations, Art. 0723, or for a commanding officer of enlisted personnel under U.S. Navy Regulations, Art. 0722. Therefore, there are *procedures in place* for formally establishing separate units and for vesting court-martial authority in the commanders of those separate units—none of which were followed in this case.

The title "commander" implies the existence of a *command*. In JAGMAN § 0106, pertaining to the authority to impose nonjudicial punishment, the Judge Advocate General indicated that the term "commander" is defined in the MCM as a "commissioned . . . officer who, by virtue of rank and assignment, exercising primary command authority over a military organization . . . which under pertinent official directives (such as the Standard Navy Distribution List (SNDL)) is recognized as a 'command.'" JAGMAN § 0106.a. The term "command" is not without meaning. It must be officially recognized. *See id.* The paragraph continues, "Note, a title does not by itself indicate authority to impose [nonjudicial punishment]—instead, the title must be associated with a recognized command."

For purpose of authority to impose nonjudicial punishment, an OIC may be designated by: "departmental orders; tables of organization; manpower authorizations; orders of a flag or general officer in command . . . ; orders of the senior officer present; or designated as a special court-martial convening authority." JAGMAN § 0106.b.

### c. Was Major B a commander by designation?

As noted above, we find the military judge's findings of fact are internally inconsistent and, in parts, clearly erroneous. Conducting a *de novo* review of his conclusions of law, we disagree with his conclusion that Major B had au-

---

[33] Judge Advocate General Instruction 5800.7F § 0723 (26 Jun 2012).

thority to authorize the 25 and 26 July 2016 searches. Major B was not a "commander" for the purposes of MIL. R. EVID. 315.

As an initial matter, even though Lieutenant Colonel W referred to Major B as an OIC, the UCMJ defines an "officer in charge" as a "member of . . . the . . . Marine Corps . . . designated as such by appropriate authority." Art. 1(4), UCMJ. Looking to the service regulations to determine what "appropriate authority" could designate an OIC, we conclude that Major B was not an OIC.

Major B's position was not designated by the Secretary of the Navy as a commander or OIC equivalent. The "RBE" of MWSS-373 was never formally established as a unit, which would require, at a minimum, written designation by the Commanding General of 3d MAW *and* notification to the Commandant of the Marine Corps and the Judge Advocate General.

Lieutenant Colonel W did not seek any formal authority to divide MWSS-373 into two commands—nor did he in fact divide MWSS-373 into two separate commands. He told his superior in command, the MAG-11 commanding officer who was a Marine Corps Colonel, that he intended for Major B to run the day-to-day operations of the "RBE" in Miramar in his absence. Even the MAG-11 commanding officer lacked the authority to designate a separate unit under applicable regulations unless he was the senior officer present within 3d MAW. Here, there is no evidence in the record that the MAG-11 commanding officer was the senior officer present within 3d MAW.

Because MWSS-373 was never formally divided into two separate units by someone with the legal authority to do so, it could not legitimately have two separate commanding officers. Lieutenant Colonel W was the commanding officer of MWSS-373 in its entirety—both the forward deployed Marines and those in the RBE. The government never contended that Major B exercised any command authority over the portion of MWSS-373 that deployed overseas. The fact that Major B executed tasking from the MAG-11 commanding officer did not elevate her to the status of the commander of MWSS-373. She exercised duties consistent with the role of an executive officer to execute the plan of the day and to sign routine administrative correspondence on behalf of the commanding officer. The unit remained a single unit, commanded by one commanding officer—Lieutenant Colonel W.

Thus, Major B was not a commander regardless of any action Lieutenant Colonel W took to empower her to execute the daily tasking of the RBE. She simply remained the MWSS-373 executive officer. Nor do we find any legal effect in the letter, citing the Navy Correspondence Manual, permitting Major B to sign correspondence as "acting" commanding officer. Therefore, as the executive officer of MWSS-373, Major B would never possess the authority to authorize searches unless full command authority for MWSS-373 devolved to

her by operation of statute or regulation as a result of Lieutenant Colonel W's absence.

       d. Was Major B a commander by devolution, as recognized in *Kalscheuer* and *Law*?

The Navy Regulations demonstrate that a commander may automatically succeed his or her predecessor in command. When that succession occurs, the officer assuming command has the same authority as the preceding commander—complete authority as a commander, not partial authority. The circumstances permitting automatic succession—including incapacity, death, leave, detachment without relief, or being away on orders—indicate that a unit may have only one commander. Either the successor *is* the commander—in every respect—until the commander returns, or the successor exercises authority short of command and the absent commander remains the commander.

Lieutenant Colonel W did not intend for complete command authority to pass to Major B. Although Lieutenant Colonel W's intent is not controlling, we find that even he did not intend for Major B to exercise full command authority. First, he specifically withheld from Major B the nonjudicial punishment and court-martial convening authority vested in *him* as the commander of MWSS-373 over the members of the RBE. Second, he retained full day-to-day operational authority over the portion of the command that deployed with him.

Major B lacked full command authority over the "RBE," and she certainly did not have the same authority as Lieutenant Colonel W over the entire MWSS-373, as formally recognized by Navy directives. Therefore, she did not "succeed" him in command within the meaning of U.S. Navy Regulation 1026.

The government argues that search authority is separate from nonjudicial punishment authority and court-martial convening authority. They argue that Major B's inability to impose nonjudicial punishment or to convene courts does not mean she lacked search authority over the members of the RBE. We disagree. That Major B lacked the authority to do the very things that commanding officers are empowered to do, reflects the fact that command did not devolve to her upon Lieutenant Colonel W's deployment.

Rather, to the extent that Lieutenant Colonel W intended or wanted Major B to approve search authorizations, the mechanism by which he attempted to effectuate his intent was impermissible.

This case is distinguishable from *Kalscheuer* and *Law*. The company executive officer in *Law* was "exercising command authority over the unit." 17 M.J. at 240. In *Kalscheuer,* the Deputy Base Commander "was functioning as the commander in connection with the command decisions then being made"

"at the time and place in question." 11 M.J. at 380. In those cases, the commander was incidentally, temporarily away from the command. In this case, as evidenced by Major B's regular reports on the status of the RBE's operations, Lieutenant Colonel W was never away from the command. In fact, he was actively involved in commanding MWSS-373 as the squadron carried out both its deployed and garrison missions. To the extent he was "absent" at all it was only from that portion of the command that did not deploy. But this "absence" was pre-planned. He discussed the division of labor between himself and Major B—all of which operated to facilitate accomplishment of the mission while he *remained in command* but deployed—with the majority of the command—away from the smaller RBE. Although Major B would accomplish the day-to-day tasking of the RBE, she routinely informed him of events, and when she signed correspondence, she did so while "acting" *on his behalf*. In sum, Major B could exercise only so much authority as Lieutenant Colonel W lawfully delegated to her. She did not have command authority, making *Kalscheuer* and *Law* distinguishable.

Accordingly, we find that Major B was not the commander of MWSS-373, or even its RBE, and therefore she lacked authority to authorize searches of the appellant's body, office, and personal property.

## B. Analysis of Exclusionary Rule

"Evidence obtained from reasonable searches conducted pursuant to a . . . search authorization . . . is admissible at trial when relevant and not otherwise inadmissible . . . ." MIL. R. EVID. 315(a). Evidence that results from unlawful searches is subject to exclusion. Exclusion is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect." *United States v. Leon*, 468 U.S. 897, 906 (1984) (quoting *United States v. Calandr*a, 414 U.S. 338, 348 (1974)).

The exclusionary rule is codified in military practice in MIL. R. EVID. 311(a). Evidence obtained unlawfully is subject to exclusion if:

> (1) the [appellant] makes a timely motion to suppress or an objection to the evidence under this rule;

> (2) the [appellant] had a reasonable expectation of privacy in the person, place, or property searched; . . . and

> (3) exclusion of the evidence results in appreciable deterrence of future unlawful searches or seizures and the benefits of such deterrence outweigh the costs to the justice system."

MIL. R. EVID. 311(a).

The appellant moved to suppress the evidence, and the military judge properly held that the appellant had a reasonable expectation of privacy in his own body and in the places and property that were searched.

Two exceptions to the exclusionary rule are potentially implicated in this case: the good faith exception and the inevitable discovery exception. We will analyze those exceptions in turn.

### 1. *Good faith*

In *United States v. Leon,* the Supreme Court held that evidence gained as a result of an unlawful search or seizure is not subject to suppression if the officers acted "in objectively reasonable reliance on a subsequently invalidated search warrant." *Leon,* 468 U.S. at 422.

The good faith exception is codified in MIL. R. EVID. 311(c)(3) and permits evidence "obtained as a result of an unlawful search or seizure" to be used if three elements are met:

> (A) the search or seizure resulted from an authorization to search, seize or apprehend issued by an individual competent to issue the authorization under MIL. R. EVID. 315(d) or from a search warrant or arrest warrant issued by competent civilian authority;

> (B) the individual issuing the authorization or warrant had a substantial basis for determining the existence of probable cause; and

> (C) the officials seeking and executing the authorization or warrant reasonably and with good faith relied on the issuance of the authorization or warrant. Good faith is to be determined using an objective standard.

Without citing the three elements of MIL. R. EVID. 311(c)(3), the military judge held that "NCIS reasonably relied in good faith" on the authorizations Major B signed because they "reasonably concluded" she had authority to sign authorizations "based on their previous interactions" with her.[34] Conducting our *de novo* review, we find the military judge's conclusion was erroneous.

The C.A.A.F. recently interpreted the MIL. R. EVID. 311(c)(3) good faith exception in *United States v. Perkins,* No. 18-0365, 2019 CAAF LEXIS 290

---

[34] AE LI at 12.

(C.A.A.F. Apr. 23, 2019). In *Perkins,* the C.A.A.F. acknowledged a conflict in its treatment of the good faith exception in *United States v. Carter,* 54 M.J. 414 (C.A.A.F. 2001) and in *United States v. Hoffmann,* 75 M.J. 120 (C.A.A.F. 2016). The conflict involved the court's treatment of the second and third elements of the exception.

In *Carter,* the court interpreted the second element of the good faith exception as being "satisfied if the law enforcement official had an objectively reasonable belief that the magistrate had a 'substantial basis' for determining the existence of probable cause." *Carter,* 54 M.J. at 422. It did so because the contrary interpretation would "effectively abolish the good faith exception in military practice." *Id.* at 421. This effective abolishment would result because any search authorization found lacking under the test in *Illinois v. Gates,* 462 U.S. 213 (1983), affirming admissibility of evidence under search warrants so long as the magistrate had a "substantial basis for . . . concluding that probable cause existed," would not qualify for the good faith exception because it would fail the second element. *Id.* (quoting *Gates,* 462 U.S. at 238) (alteration in original) (citation omitted) (internal quotation marks omitted).

In *Hoffmann,* without citing *Carter,* the C.A.A.F. simply applied a literal reading of MIL. R. EVID. 311(c)(3) and found that because the magistrate lacked a substantial basis to believe probable cause existed, that ended the good faith analysis. *Hoffmann,* 75 M.J. at 128.

In *Perkins,* the C.A.A.F. resolved this discrepancy in favor of the interpretation it used in *Carter.* In deciding *Perkins* and affirming the holding in *Carter,* the C.A.A.F. cited Supreme Court precedent interpreting the good faith exception, such as *United States v. Leon,* 486 U.S. 897 (1984), and *Massachusetts v. Sheppard,* 468 U.S. 981 (1984). The holdings in *Perkins* and *Carter* align our practice with those precedents.

*Perkins* focused on the second and third elements of the exception under M.R.E. 311(c)(3)(B) and (C). However, the C.A.A.F. noted that this court evaluated the first element under MIL. R. EVID. 311(c)(3)(A), finding that the individual was competent to authorize a search of the appellant's "on-base residence," and ultimately the C.A.A.F. agreed that all three elements of the good faith exception were met. *Perkins,* 2019 CAAF LEXIS 290 at *9, *20.

We find no authority, in *Perkins* or elsewhere, that permits us to interpret the first element—that the search authorization was issued by a competent individual—in light of the third element. That is, we cannot apply the good faith exception to support the admissibility of evidence obtained in a search that was unlawful because it was not authorized by a competent individual—even if we were to find that agents reasonably believed Major B had search authority.

The Sixth Circuit Court of Appeals addressed a similar case in *United States v. Scott,* 260 F.3d 512 (6th Cir. 2001). There, officers approached a retired judge, who issued a search warrant. *Id.* at 513-14. The trial court denied a defense motion to suppress evidence, relying on the good faith exception. *Id.* at 514. The Sixth Circuit reversed, in what it noted was a case of first impression, holding that the good faith exception in *Leon* "presupposed that the warrant was issued by a magistrate or judge clothed in the proper legal authority." *Id.* at 515. The court held that the warrant contained more than a "mere technical deficiency" and it was "void *ab initio.*" *Id.*[35]

Other Circuit Courts of Appeals have applied the good faith exception in circumstances when a warrant was void *ab initio* after a magistrate authorized a search outside the issuing magistrate's territorial jurisdiction under Federal Rule of Criminal Procedure 41. *See, e.g.*, *United States v. Henderson,* 906 F.3d 1109, 1118 (9th Cir. 2018); *United States v. Horton,* 863 F.3d 1041 (8th Cir. 2017); *United States v. Workman,* 863 F.3d 1313 (10th Cir. 2017).[36] Some courts have admitted the evidence "so long as the executing officers had an objectively reasonable belief that the warrant was valid" because the courts held that "[p]enalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." *Henderson,* 906 F.3d at 1119 (alteration in original).

In spite of these holdings, we find this case to be distinguishable from the more recent precedents and we are persuaded by the reasoning in *Scott.* Those Circuit Courts that have applied the good faith exception where the search was void *ab initio* did so only after concluding that the deficiency resulted from the magistrate authorizing a search *outside* his or her district. By contrast, the Sixth Circuit, in *Scott*, concluded the good faith exception did

---

[35] The Sixth Circuit later distinguished *Scott* in a case in which a judge authorized a search outside of the judge's jurisdiction in *United States v. Master,* 614 F.3d 236 (6th Cir. 2010). In *Master,* the Sixth Circuit applied the good faith exception when an investigator sought a search warrant from a competent judge in the jurisdiction where he reasonably believed the suspect resided and executed the warrant in a different jurisdiction. *Id.* at 243.

[36] The cases cited involved a complex child pornography operation in which a magistrate in the Eastern District of Virginia authorized installation of tracking software, known as a network intrusion device, on a child pornography website server in the magistrate's district, and that software in turn installed "malware onto the user's computer," which enabled law enforcement officials to identify users in other districts. *Workman,* 863 F.3d at 1316.

not apply, because the individual who authorized the search was not competent to authorize any search. The appellant's case is similar.

Absent binding authority requiring the interpretation the government proposes, we must read the first element as written. For the reasons described above, Major B was not a "competent" commander under MIL. R. EVID. 315(d)(1) to issue the search authorizations, and no civilian warrant existed.

We next consider whether the evidence would have nevertheless been admissible because it would have been inevitably discovered.

*2. Inevitable discovery and Lieutenant Colonel W's 18 November 2016 authorization*

Under MIL. R. EVID. 311(c)(2), it is an exception to the exclusionary rule if evidence obtained in an unlawful search or seizure "would have been obtained even if such unlawful search or seizure had not been made." The C.A.A.F. has held:

> [A]fter an accused challenges the legality of a search, the prosecution must, by a preponderance of the evidence, establish . . . that *when the illegality occurred,* the government agents possessed, or were actively pursuing, evidence or leads that would have inevitably led to the discovery of the evidence and that the evidence would inevitably have been discovered in a lawful manner had not the illegality occurred.

*United States v. Dease,* 71 M.J. 116, 122 (C.A.A.F. 2012) (first alteration in original) (emphasis added) (quoting *United States v. Kozak,* 12 M.J. 389, 394 (C.M.A. 1982)).

a. Inevitable discovery by proper action if agents discovered their mistake

It is not enough that the agents *would* have obtained a search authorization from the proper commander had they realized that Major B did not have authority to authorize the search. The doctrine of inevitable discovery "cannot rescue evidence obtained via an unlawful search simply because probable cause existed to obtain a warrant when the government presents *no* evidence that the police would have obtained a warrant." *United States v. Wicks,* 73 M.J. 93, 103 (C.A.A.F. 2014) (alteration in original).

At trial, the government did not argue that they were pursuing the same evidence through alternative means. During the Article 39(s) motions hearing, the government presented the testimony of NCIS Special Agent E, who was the agent who first interviewed Sergeant N. Although Special Agent P

applied for and received all three of the July 2016 search authorizations at issue, the government did not present Special Agent P's testimony on the motion. Special Agent E's testimony did not demonstrate whether she was a peer, supervisor, or co-worker to Special Agent P.

Special Agent E testified that NCIS agents had been providing reports and updates on MWSS-373 cases to Major B in Lieutenant Colonel W's absence. She testified that they "would have approached either the MAG-11 CO or the base CO for the authorization for the search" if Major B had stated she lacked the authority to order searches.[37] However, Special Agent E was not apparently involved in drafting or presenting any of the July 2016 search authorizations, and the record does not establish why Special Agent E was qualified to speculate about Special Agent P's likely action.[38]

The government cites *United States v. Eppes,* 77 M.J. 339 (C.A.A.F. 2018), in arguing that the agents would have sought authorization from a competent authority had they known that Major B could not authorize searches. In *Eppes,* investigators prepared an affidavit "in support of a request for separate search authority" for a number of items, including Eppes' personal bags. *Eppes,* 77 M.J. at 347. Although a military magistrate approved the search, the authorization did not "expressly authorize a search of [Eppes'] bags." *Id.* at 343. The C.A.A.F. held that the inevitable discovery doctrine applied because it was "likely the omission of the bags from the search authorization was simply a scrivener's error because the agent who swore the affidavit also apparently authored the search authorization signed by the magistrate." *Id.* at 347.

As an initial matter, we find the potential scrivener's error in *Eppes* to be distinguishable from the appellant's case. In *Eppes,* a competent authority approved the search. We further distinguish *Eppes* because the court's opinion was also based on two factors not present in this case: (1) the officers in *Eppes* were "actively pursuing leads that would have led them to the same evidence";[39] and (2) because the officers conducted their search "within the confines of the affidavit." *Id.* at 348. In the appellant's case the investigators

---

[37] Record at 42.

[38] Appellate Exhibits VIII and IX contain the affidavit, applications, attachments, and search authorizations pertaining to the appellant's case. No document bears the name of Special Agent E.

[39] Specifically, in *Eppes,* the investigators used both military search authorizations and a civilian warrant, and they built probable cause for subsequent searches based on the fruits of their prior searches.

did not conduct any additional seizures after 26 July 2016, even though they believed the cracked screen iPhone was pertinent to the case, it was never recovered. Additionally, the 26 July 2016 search authorization was based on an affidavit reciting probable cause to seize and search a cracked-screen iPhone. Finding no such iPhone, agents instead seized and searched the Samsung Galaxy SIII.

      b. Inevitable discovery based on Lieutenant Colonel W's November authorization

The government argues that Lieutenant Colonel W's authorization, signed on 18 November 2016, means discovery of the evidence was inevitable and thereby saves the evidence from suppression. The government further argues that "once a concern was raised about [Major B's] authority, they did not search the evidence seized until [Lieutenant Colonel W] returned and authorized the search," which "cured any defect in the original search authorization."[40]

We do not agree that the record demonstrates that the government did not complete the searches under the 25 and 26 July 2016 authorizations. At least one item of evidence, the Samsung Galaxy SIII, was searched prior to 12 August 2016.[41] An NCIS-generated report dated 21 November 2016 indicates that the agents were notified on 12 September 2016 that Major B may have lacked search authority. The report states:

> As a consequence, the NCIS Cyber Agent that was analyzing two of [the appellant's] cellular telephones was told to stop examinations/analyses and, ultimately, the U.S. Army Criminal Investigations Laboratory (USACIL) was told to stop all examinations/analyses on the submitted evidence until the updated [search authorization] could be obtained.[42]

The report does not indicate when agents ordered all ongoing searches and examinations to be stopped. There is insufficient evidence in the record to indicate that the searches were *not* substantially completed prior to Lieutenant Colonel W's authorization.

Even if Lieutenant Colonel W's 18 November 2016 authorization could justify resumption of the paused searches, it did not justify the initial *seizure*

---

[40] Appellee's Answer of 23 Apr 19 at 16.

[41] AE VIII at 42.

[42] AE VIII at 51.

of evidence.[43] Searches and seizures are "separate concepts," requiring separate Fourth Amendment analyses. *United States v. Wallace,* 66 M.J. 5, 8 (C.A.A.F. 2008) (citing *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 616 (1989)). The seizure occurs when there is "some meaningful interference with an individual's possessory interest." *Id.* (quoting *United States v. Jacobsen,* 466 U.S. 109, 113 (1984)). A seizure may or may not be accompanied by an "attendant search." *Id.*

More importantly, the record does not let us properly evaluate Lieutenant Colonel W's search authorization. Although the affidavits supporting the 25 and 26 July 2016 searches are included in the record, any affidavit used to support the 18 November 2016 search authorization was not so appended. The affiant was different—Special Agent B. As further described below, the 18 November 2016 search authorization repeats glaring errors contained in the 25 and 26 July 2016 authorizations. We cannot presume that the affidavit correctly recited the facts, or that the facts revealed to Lieutenant Colonel W did not include any facts discovered during the initial phases of the searches based upon the improper authorization granted by Major B. Lieutenant Colonel W's authorization simply re-authorized the same searches of 25 and 26 July 2016, even though investigators would have known that there was no responsive evidence on at least one of the cellular phones and that the iPhone with a cracked screen was never recovered.

The 18 November 2016 search authorization does not make discovery of the evidence inevitable. Therefore, we find that there is no exception from the exclusionary rule. Hence, the evidence is subject to exclusion if it meets the balancing test under MIL. R. EVID. 311(a)(3).

*3. Do the Benefits of Deterrence from Exclusion Outweigh the Costs to the Justice System?*

The military judge recited, without analysis, that "exclusion of the evidence . . . would not result in appreciable deterrence of future unlawful searches, nor would the benefit outweigh the costs to the justice system."[44]

---

[43] The government cites dicta in *Hoffmann* which posits the theory that a valid search authorization, issued months later, *could* "overcome the fact that the . . . [evidence searched] was seized illegally." *Hoffmann,* 75 M.J. at 125. However, the C.A.A.F. found the time-late search authorization was not based on probable cause and ruled the evidence should have been suppressed.

[44] AE LI at 12.

We disagree. Exclusion of the evidence would deter unlawful searches in two ways.

### a. Deterrence relating to seeking search authorization from an individual incompetent to issue it

First, exclusion will deter future commanders from impermissibly delegating their inherent command authorities, to include their authority to authorize searches, to others. Although Lieutenant Colonel W attempted to delegate almost all of his command authorities over the RBE, and his delegation was broader than the specific delegations of search authority that were given in *Law* and *Kalscheuer,* the legal effect was the same. He could not delegate search authority. A regulatory process was in place to formally establish the RBE as unit with its own commander or officer in charge with its own independent command authorities, but Lieutenant Colonel W did not follow it. There is no evidence in the record that anyone at any level within the MWSS-373 chain of command consulted a judge advocate for advice about the proposal to divide the MWSS in two separate and independent units. Nor is there evidence that anyone consulted a judge advocate on the search authorizations in this case. Exclusion of the evidence will deter commanders from failing to seek legal advice prior to taking actions which serve to impermissibly delegate search authority.

Second, exclusion will deter those who are *not commanders*, and therefore lack command authority, from attempting to exercise authorities they do not possess. And exclusion will reinforce the need for investigators to ensure that they have obtained authorization to search from a commander with the authority to approve the search. Here, no investigator ever believed Major B was the *actual* commanding officer of MWSS-373, and Special Agent E's testimony demonstrates that at least one agent in the field office was aware that the MAG-11 commanding officer and the 3d MAW commanding general— both located at Miramar—were empowered to authorize the searches if Lieutenant Colonel W was out of communication.

### b. Deterrence related to careful document drafting

Additionally, we find several glaring flaws with the search authorizations that Special Agent P prepared and that Major B signed. We find that exclusion of the evidence will deter careless drafting by law enforcement officials in the future and exclusion will deter search authorities from signing blatantly flawed authorizations.

All three search authorizations misspell the appellant's name in the header, citing the case as "United States of America vs. MSGT Robert Amendariz, USMC."[45] The appellant's name is Roberto Armendariz. Though not legally dispositive, and not a ground for suppression, we note that Special Agent P, Special Agent B, Lieutenant Colonel W, and Major B, all failed to correct this fundamental, repeated error.

In addition to the scrivener's errors, the search authorizations lack specificity as to the places to be searched. Under the Fourth Amendment, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to searched, and the persons or things to be seized."[46] "General warrants . . . are prohibited by the Fourth Amendment" because they permit officers to engage in "a general, exploratory rummaging in a person's belongings." *Andresen v. Maryland,* 427 U.S. 463, 480 (1976).

The first 25 July 2016 authorization granted authority to search "[a]*ny vehicle* registered to [the appellant] should the articles of clothing from the incident not be discovered within [the appellant's] workspace."[47] Special Agent P made no apparent attempt to ascertain any identifying characteristics of any vehicle the appellant may have owned. The MWSS-373 commander would not have authority to order a search of a vehicle maintained anywhere other than in an area under the control of the MWSS-373 commander.[48] If, for instance, the appellant owned multiple vehicles and one of those vehicles was located on board Miramar in an area not under the control of the MWSS commander or it was located in another state for the use of a family member, the MWSS commander would not have authority to search that vehicle. Yet Special Agent P requested, and Major B granted, authority to search, without limitation to location, "[a]ny vehicle" registered to the appellant.[49]

Additionally, Special Agent P requested, and Major B approved the search for data on the appellant's cellular phones without limitation. Later, Special Agent B made the same request, and Lieutenant Colonel W approved it. The 25 July, 26 July, and 18 November 2016 search authorizations, prepared by

---

[45] AE VIII at 30, 33, 36.

[46] U.S. CONST. amend. IV.

[47] AE VIII at 31 (emphasis added).

[48] *See* MIL. R. EVID. 315(d)(1); MIL. R. EVID. 315(c)(3).

[49] *Id.*

two different agents, all reference two attachments listing the "Location and Property to be Searched" and "Items to be Seized/Searched," respectively. All three search authorizations granted the agent authority to search, *without limitation*, the following items from the appellant's cell phone:

> Files, data, images, software, operating systems, deleted files, altered files, system configurations, passwords and encryption of drive and disk configurations, date and time, and unallocated and slack space, stored photographs, videos, chat messages, stored electronic mail, including attachments, web browsing history, stored web pages, web caches, internet history files, peer to peer file sharing history, stored documents, and data stored in any application.[50]

The search authorizations purport to authorize a general search of all of the appellant's cell phone data, not limited to evidence pertaining to Sergeant N's allegation of sexual assault. They list all classes of data without limiting their search to evidence pertaining to the crime of which the appellant was suspected and without any temporal limitation. *See generally Andresen v. Maryland,* 427 U.S. at 479-82 (holding that a warrant was not general even though it authorized seizure of "fruits, instrumentalities, and evidence of crime at this [time] unknown" because that phrase was modified by a limiting phrase relating to the offense in question).

The affidavit in support of the 25 July 2016 search authorization recites Special Agent P's "opinions and conclusions" that "[w]ithin the cellular telephone it is also believed there will be evidence of the communication between [the appellant and Sergeant N] that may provide additional context of the nature of their relationship prior to this incident."[51] The search authorization does not expressly incorporate the affidavit, and nothing in the affidavit or search authorization limits the search of the appellant's cellular phone for *only* communications pertaining to Sergeant N's allegation.

The affidavit in support of the 26 July 2016 search authorization similarly contains no express limitation, but recites under "Opinions and Conclusions" that:

---

[50] AE VIII at 30-32 (Command Authorization of 25 Jul 2016, with attachments); AE VIII at 33-35 (Command Authorization of 26 Jul 2016, with attachments); AE VIII at 36-38 (Command Authorization of 18 Nov 2016, with attachments).

[51] AE IX at 23.

> The items listed in [the pertinent attachment] are believed to contain evidence related to the sexual assault of [Sergeant N] within a cellular telephone [sic] was utilized to communicate with [the appellant].[52]

This sentence is the result of an apparent cut-and-paste error, and it does nothing to limit the scope of the general search that Special Agent P requested and Major B granted.

We do not find that these affidavits expressly limit the general search permitted by the search authorization. Even if the affidavits seemed to limit the general search, we cannot consider them for that purpose. Unless the search authorization expressly, or by reference, incorporates the supporting affidavit, the affidavit cannot cure a particularity defect in the search authorization.

In *Groh v. Ramirez,* 540 U.S. 551 (2004), the Supreme Court held that a warrant was "plainly invalid" because it did not describe the "things to be seized." 540 U.S. at 557. Although the search warrant application listed the items to be seized with particularity, the warrant "did not incorporate by reference the itemized list contained in the application." *Id.* at 554-55. The warrant did "recite that the Magistrate was satisfied the affidavit established probable cause." *Id.* at 555. Nevertheless, the Court held that "[t]he fact that the application adequately described the 'things to be seized' does not save the warrant from its facial invalidity" because the Fourth Amendment "by its terms requires particularity in the warrant, not in the supporting documents." *Id.* at 557 (emphasis omitted). The Court then surveyed several Circuit Court of Appeals cases and noted that "most Courts of Appeals have held that a court may construe a warrant with reference to a supporting application or affidavit if the warrant uses appropriate words of incorporation, and if the supporting document accompanies the warrant." 540 U.S. at 557-58.

In this case, similar to the facts in *Groh v. Ramirez,* the command authorization stated that the person authorizing the search was "satisfied that there is probable cause . . . as stated in the supporting affidavit(s)."[53] However, it did nothing to "incorporate by reference" any language in the affidavit that might serve to limit the general search of the appellant's phones. 540 U.S. at 554-55.

---

[52] AE IX at 31.

[53] AE VIII at 30.

As a further reason justifying suppression of the evidence, Special Agent P sought and received permission to search a third cellular phone after already seizing two. Probable cause was based on the statement of a witness who saw the appellant retrieve an iPhone with a cracked screen under suspicious circumstances, which suggested that the appellant deliberately hid this particular phone off base after he was ordered to return to base without explanation. Although probable cause was specific to an iPhone with a cracked screen, the search authorization was not specifically limited to that uniquely identifiable iPhone. Instead, it authorized search of the appellant's person, workspace, and "[a]ny vehicle registered" to him for *any* cellular telephone. Unable to find an iPhone with a cracked screen, Special Agent P seized and searched a Samsung Galaxy SIII.

Because of these glaring errors, we cannot presume that any affidavit presented to Lieutenant Colonel W in November 2016 was valid. And we are convinced that suppression of evidence will deter further similar abuses. We remind law enforcement officers and commanders of their duty to carefully review the documents to be used to justify such significant intrusions into a Service Member's body and property. Accordingly, we find that all evidence resulting from the 25 and 26 July and 18 November 2016 search authorizations to be inadmissible.

*4. Was the appellant prejudiced by admission of inadmissible evidence?*

Even though we find the military judge abused his discretion in denying the defense motion to suppress evidence, the appellant is entitled to relief only if he can show material prejudice to a substantial right. Article 59(a), UCMJ. The error here is of a "constitutional dimension." *Hoffmann,* 75 M.J. at 128. Constitutional error is harmless only when "it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* (quoting *Mitchell v. Esparza,* 540 U.S. 12, 17-18 (2003)). The burden is on the government to prove the constitutional error was harmless. *See id.* at 128. An error that "did not contribute to the verdict" is one which was "unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." *Id.* (quoting *Yates v. Evatt,* 500 U.S. 391, 403 (1991)).

The searches of the appellant's body and property yielded evidence that the government used to establish the appellant's guilt to each and every offense of which he was convicted. First, the analysis of the appellant's DNA exemplar enabled the government to argue the appellant's DNA was present inside Sergeant N's underwear and on her external genitalia. Second, the search of his underwear revealed the presence of Sergeant N's DNA. Third, the search of the appellant's cellular phones yielded evidence that the Samsung Galaxy SIII was in factory reset mode. The military judge allowed the

government to argue that the appellant "may have hidden a mobile phone outside the gate and purchased a brand new mobile phone despite the fact that he already had a phone" to show the appellant's consciousness of guilt in relation to the Article 92, UCMJ, violations and the Article 134, UCMJ, adultery specification.[54]

Although in some cases, DNA may not be of central importance, in this case it was. At trial, the government characterized the DNA evidence as "one of the strongest pieces of evidence the government has."[55]

The appellant never conceded that he committed any of the charged sexual acts or contact. The appellant made no statements to NCIS. The only statement admitted at trial was a comment the appellant made to a Gunnery Sergeant who testified that the appellant told him that Sergeant N made a sexual advance upon him; he rejected her advances; that she "didn't take it too well"; and that she "proceeded to kind of egg him on and call him out for" rejecting her advance.[56]

During argument, the defense never conceded the government had proved the sexual act or any specific sexual contact. The defense's position was two-fold: (1) any contact, which was not specifically admitted, was consensual and Sergeant N falsely alleged it was non-consensual because she felt guilty that she had cheated on her boyfriend; and (2) Sergeant N's account was not credible.

In opening, the defense counsel conceded the appellant became "too close" to Sergeant N, that they "crossed the line" and that Sergeant N "cheated on her boyfriend," without specifying how.[57] Defense counsel conceded that the appellant and Sergeant N exchanged "familiar" text messages.[58] Defense counsel stated he expected Sergeant N would "continue to deny that anything that happened . . . between the two was consensual."[59] He stated there was "mutual touching" and that the SAFE findings were "consistent with consensual sexual acts."[60]

---

[54] Record at 633.

[55] *Id.* at 128.

[56] *Id.* at 454.

[57] *Id.* at 332.

[58] *Id.*

[59] *Id.* at 334.

[60] *Id.* at 335.

In closing, defense counsel again stated the two "got too close to each other and crossed the line" and that Sergeant N "cheated" on her boyfriend.[61] He explained that no one heard any noises because they were being "secretive" and "didn't want to get caught messing around."[62] Defense counsel further argued that it was not "unreasonable" to believe that Sergeant N "came onto" the appellant; that he "gave in"; that they "fooled around a little bit"; then caught themselves and stopped.[63] He characterized the government's evidence as being that the two "supposedly had sex."[64] He also said, "[t]hey hooked up."[65]

But the arguments and statements of counsel are not evidence. *United States v. Fletcher,* 62 M.J. 175, 183 (C.A.A.F. 2005) (citation omitted). In spite of the defense counsel's concessions, we cannot find that the DNA evidence was harmless beyond a reasonable doubt. We find the appellant was prejudiced, and this prejudice extends to every offense of conviction except for Additional Charge I, alleging an Article 92, UCMJ, orders violation for fraternization.

Without evidence of penetration, there could be no conviction for sexual assault or adultery. The DNA evidence obtained from the appellant and the evidence of Sergeant N's DNA in the appellant's underwear both corroborated Sergeant N's claim that the appellant penetrated her vulva with his penis. Consequently, we find the evidence substantially prejudiced the appellant with regard to the offenses charged in Charge II, Specification 3 and the Specification of Additional Charge II.

Looking to the evidence supporting the conviction for sexual contact under Charge II, Specification 4, we find this conviction turned on Sergeant N's credibility.[66] Sergeant N testified the offense occurred and the only statement of the appellant admitted at trial denied that he initiated or participated in any sexual contact, rebuffing Sergeant N's advances. As we noted above, the DNA evidence strongly suggested that the appellant penetrated Sergeant N's vulva with his penis. This strongly corroborated Sergeant N's version of

---

[61] *Id.* at 650.

[62] *Id.* at 651.

[63] *Id.* at 660.

[64] *Id.* at 663.

[65] *Id.* at 664.

[66] Although male DNA was found on the outside of Sergeant N's bra, no "conclusive[ ]" interpretations could be made. PE 8 at 3.

events in comparison to the appellant's statement. We cannot find beyond a reasonable doubt that the members' verdict was not impacted by the erroneously admitted evidence.

We next analyze prejudice to the appellant in the context of the two Article 92 offenses. The Specification under Charge I alleged that the appellant violated the the Department of Defense Joint Ethics Regulation, DoD 5500.07-R, by misusing a government office for "sexual activity."[67] This offense could be proven by an act of sex or a sexual contact short of sex. We cannot find that the DNA evidence—which was highly suggestive of sex—had no impact on, or was unimportant to, the members' finding.

We finally analyze the sole Specification under Additional Charge I, alleging fraternization under Article 92, UCMJ for violating Article 1165 of the U.S. Navy Regulations by "having an unduly familiar relationship" with Sergeant N.[68] The specification alleging fraternization could be proven by an act short of sex—it could have been based on kissing, "fooling around," or merely exchanging overly familiar text messages. The appellant told the Gunnery Sergeant that Sergeant N made a sexual advance on him. This took place behind a closed door after Sergeant N had texted the appellant on his personal cell phone and asked him to roll her uniform sleeves. The ongoing text message conversation establishes that the appellant engaged in an unduly familiar relationship with a Marine several grades junior to him in the same command. The government admitted the appellant's text message conversation with Sergeant N as PE 11. This evidence was provided by Sergeant N and was not the result of any of the government's searches of the appellant's property. Based on PE 11, combined with Sergeant N's testimony and the appellant's statement to the Gunnery Sergeant, we find that the improperly admitted evidence did not impact the finding of guilt on this specification.

However, we must also analyze whether the MIL. R. EVID. 404(b) evidence impacted the findings. The government was permitted to argue that the appellant deliberately hid a cell phone and purchased a new one because he knew that the contents of his old phone would incriminate him. In light of the content of the text messages between the appellant and Sergeant N, Sergeant N's testimony, and the appellant's statement admitting that some form of unduly familiar contact occurred, we find beyond a reasonable doubt that the improperly admitted evidence did not impact the findings. In light of the overwhelming evidence that *some form of affectionate contact* took place in

---

[67] Charge Sheet.

[68] *Id.*

the appellant's office, we find the evidence seized unlawfully to be "unimportant" in relation to the other evidence.

Accordingly, we find that the erroneous admission of evidence prejudiced the appellant with regard to all offenses of which he was convicted, except the Specification of Additional Charge I.

## C. Remaining Assignments of Error

In light of our action setting aside all of the appellant's convictions with the exception of the Specification of Additional Charge I, we find the remaining AOEs are either moot or lack merit.

## III. Conclusion

The findings of guilty to Charge I and its Specification; Charge II, Specifications 3 and 4; and Additional Charge II and its Specification and the sentence are **SET ASIDE**. The appellant's conviction of the Specification of Additional Charge I is **AFFIRMED.** The Record of Trial is returned to the Judge Advocate General. A rehearing on the set aside convictions is authorized. In the alternative, a rehearing on the sentence for the Specification of Additional Charge I is authorized, or in the alternative, the convening authority can approve a sentence of no punishment.

Senior Judge HUTCHISON and Judge LAWRENCE concur.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court